UNITED STATES of America, Appellant,

v.

Clayton Eugene DeFRIES, a/k/a Gene; Clyde E. Dodson; Reinhold Schamann, a/k/a Fred; Claude W. Daulley; Alexander C. Cullison, a/k/a Doc; Karl M. Landgrebe; Donald K. Masingo; Michael A. Ribera; George Butler, Jr.; William M. Fast; Walter J. Browne; Thaddeus Kedzierski, a/k/a Ted; Durwin W. Davis; Michael A. Baker; Vincent T. Oliveri; Paul T. Reyburn, Appellees.

No. 94–3110.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 13, 1994.

Decided Jan. 13, 1995.

Frank J. Marine, Atty. U.S. Dept. of Justice, argued the cause for appellant. With him on the briefs were Eric H. Holder, Jr., U.S. Atty., Sotiris A. Planzos and Stephen D. Kelly, Attys., U.S. Dept. of Justice.

Stuart A. Levey argued the cause, for appellees DeFries, et al. With him on the brief, for appellee DeFries was R. Stan Mortenson. Michele A. Roberts was on the brief, for appellee Dodson. Richard A. Hibey was on the brief, for appellee Schamann. Gerard F. Treanor, Jr., and Judith Wheat were on the brief, for appellee Daulley. Thomas G. Green, Mark Hopson and Jeffrey T. Green were on the brief, for appellees Cullison and Baker. Donald T. Bucklin entered an appearance, for appellees Cullison and Baker. Stuart F. Pierson and Richard L. Cys were on the brief, for appellee Masingo. Robert L. Tucker, Asst. Federal Public Defender, was on the brief, for appellee Ribera. A.J. Kramer, Federal Public Defender, entered an appearance, for appellee Ribera. James E. Sharp and Paul L. Knight were on the brief, for appellees Butler and Kedzierski. Henry W. Asbill and L. Barrett Boss were on the brief, for appellee Fast. Thomas E. Scott and Henry Salas were on the brief, for appellee Davis. Steven C. Tabackman was on the brief, for appellee Oliveri. Francis D. Carter was on the brief, for appellee Reyburn.

Before: WILLIAMS, HENDERSON, and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge.

The defendants in this case are union officials indicted for crimes relating to their manipulation of union elections and misuse of union offices. Counts three and four of the

indictment charged them with mail fraud under 18 U.S.C. § 1341 for their alleged theft, alteration, and destruction of ballots in a 1988 union merger referendum. The district court dismissed those counts on the grounds that the theft of ballots, and the resulting interference with union members' rights to the honest conduct of union affairs, did not constitute significant deprivations of union property, and thus, under *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), were not cognizable under § 1341, 858 F.Supp. 1. Because we find that the referendum ballots and the information that they embodied indeed constitute "property" within the meaning of § 1341, we reinstate those counts of the indictment and remand for trial.

## I.

The fifteen defendants are former national, regional, and local officials of the District No. 1–Pacific Coast Division, Marine Engineers Beneficial Association, a formerly independent labor organization that was merged into the National Maritime Union in March 1988. In June 1993, a federal grand jury returned a ten-count indictment alleging that from September 1984 through December 1991 the defendants had fraudulently procured their election and re-election to union offices and had managed the affairs of the union so as to enrich themselves at union expense, negotiating for themselves roughly two million dollars' worth of severance payments following the union merger. The indictment specifically charged the defendants with one count of racketeering, one of embezzlement, two of conspiracy, two of extortion, and four of mail fraud.

The two mail fraud counts at issue here relate to the defendants' alleged interference with an internal referendum on the proposed union merger conducted through the mails in early 1988. The indictment alleged that various of the defendants collected unmarked ballots from union members and voted them in favor of the merger, opened sealed ballots and replaced anti-merger votes with ones favoring the merger, and obtained and voted duplicate ballots, all in violation of the union's by-laws. Other defendants were accused of supervising and directing the operation. The indictment charged that the mailing of false referendum ballots constituted an illegal scheme to defraud the union and its members of two separate property interests, specified in indictment paragraphs 88(a) and (b): actual property in the form of the referendum ballots (¶ 88(a)), and "property rights guaranteed by [the] union Constitution, By-laws and election procedures ... and by [federal labor law] to vote in secret and to participate in a fair and honest election regarding the 1988 merger referendum" (¶ 88(b)). The indictment stated that the two unions (and later their pension trusts) did actually merge as a result of the referendum's apparent approval of the proposed merger agreement.

In district court, defendants challenged these mail fraud counts on the grounds that neither of the union's two interests identified in the indictment constituted property protected against deprivation by the mail fraud statute as interpreted by the Supreme Court in *McNally*. The district court agreed. It held that the union members' asserted right to fair elections was analogous to (if less nebulous than) the general public's right to honest government, an interest found in *McNally* to be insufficiently like property for it to be protected by 18 U.S.C. § 1341. Although the court did not specifically address the question of whether or not the ballots themselves constituted property, it clearly implied that their only value was to effect the union members' rights to a democratic organization and that the ballots thus had no value cognizable under the mail fraud statute. The district court dismissed the two counts, and the government now appeals.

## II.

The federal mail fraud statute makes it unlawful to use the mails in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," 18 U.S.C. § 1341. In *McNally*, 483 U.S. at 358–60, 107 S.Ct. at 2880–82, the Court held that the phrases "to defraud" and "for obtaining money or property" are not wholly disjunctive; rather, the

concept of "fraud" has historically entailed some deprivation of money or property, and the statute therefore reaches only those schemes designed to interfere with another's property rights. The *McNally* Court accordingly overturned a conviction for mail fraud that was based on the defendants' having deprived the citizens and government of Kentucky only of their "right to have the Commonwealth's affairs conducted honestly," *id.* at 352, 107 S.Ct. at 2878, and not of any property right, traditionally considered.[1]

We do not address the government's claim that rights to honest union governance (the basis of ¶ 88(b) of the indictment) are so different from political rights as to render *McNally* inapplicable, but turn directly to the character of the allegedly stolen ballots, the focus of ¶ 88(a). Defendants concede, as they must, that these ballots were indeed the tangible property of the union: the election procedures detailed in the union's constitution make clear that the union is solely responsible for the preparation and distribution of official ballots, that union members may not transfer these ballots freely, and that the ballots must be returned to the union and secured in a depository to which no other parties have access. Rather, the defendants argue that these ballots are of *de minimis* value—that they are worth no more than the paper and ink with which they are printed—and therefore fail to meet some threshold standard of significance implicit in the mail fraud statute.

It is difficult to see where the defendants find this *de minimis* exception. The mail fraud statute speaks only of "money or property" generally, not of property above a certain value. *McNally* incidentally quotes language from a 1924 case suggesting that the words " 'to defraud' ... usually signify the deprivation of *something of value* by trick, deceit, chicane or overreaching," 483 U.S. at 358, 107 S.Ct. at 2881 (emphasis added) (quoting *Hammerschmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924)), but it does so simply to demon-

strate that the mail fraud statute protects only traditional forms of property; there is no suggestion that once the subject of a fraud *is* determined to be property, it must additionally meet some threshold of value.

Given the absence of any statutory hint of a threshold minimum, it is hardly surprising that several courts have found § 1341 applicable to what at first glance appear to be exceedingly small property interests. For example, several circuits have held that unissued permits in the hands of the state— "mere pieces of paper and ink," to borrow a phrase from the defendants' brief—count as property of the government, so that obtaining a permit through a dishonest application constitutes fraud. Thus in *United States v. Bucuvalas,* 970 F.2d 937, 945 (1st Cir.1992), the court held that 18 U.S.C. § 1341 applied to the defendants' fraudulent acquisition of city liquor and entertainment licenses, reasoning that the scheme deprived the city of "the right to control the issuance" of the licenses. In doing so, the court looked beyond the pieces of paper to the interests they signified. And *United States v. Martinez,* 905 F.2d 709, 714–15 (3d Cir.1990), found mail fraud in the defendant's dishonest applications for medical licenses, as the deception interfered with the state's "right to keep its medical licenses to itself and to bestow them on persons who had fairly earned them." Both decisions drew on the Supreme Court's decision in *Carpenter v. United States,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), which held that leaking the confidential contents and timing of future *Wall Street Journal* stock market columns constituted mail and wire fraud, even though the newspaper suffered no readily monetizable loss as a result of the scheme, did not lose possession of the information, and was not prevented from making first public use of it. "It is sufficient," wrote the Court, "that the Journal has been deprived of its right to exclusive use of the information, for exclusivity is an important aspect of confidential business in-

---

1. In November 1988, Congress overturned *McNally* by passing 18 U.S.C. § 1346, which explicitly extended § 1341's "scheme or artifice to defraud" to include "a scheme or artifice to deprive another of the intangible right of honest

services." There is no question, however, that the rule of *McNally* applies to the conduct at issue here, which took place eight months before Congress enacted § 1346.

formation and most private property for that matter." *Id.* at 26–27, 108 S.Ct. at 321. *Carpenter* makes clear that a deceit may still constitute a scheme "for obtaining . . . property" even though the thing interfered with is intangible and the scheme deprives the victim not of his or her entire ownership interest in that intangible, but of only one of the several rights in the bundle. That the courts find violations of § 1341 in such fine deprivations of property seems to suggest the absence of any *de minimis* exception.

Defendants cite only two circuit court cases recognizing a *de minimis* exception to the mail fraud statute: *United States v. Schwartz*, 924 F.2d 410 (2d Cir.1991), and *United States v. Granberry*, 908 F.2d 278 (8th Cir.1990). Both suggest that a state's interest in the paper and ink comprising single permits (arms export licenses in the first case and a school-bus operator's permit in the latter) is so minimal that its deprivation due to a dishonest permit application cannot trigger the sanction of 18 U.S.C. § 1341. Although we are not today deciding the question of unissued licenses, we note that these two cases are inconsistent with the preceding analysis and do not represent any consensus among the circuits.[2]

In any event, we need not decide whether § 1341 permits a *de minimis* exception of the sort found by the courts in *Schwartz* and *Granberry*, for the ballots at issue in this case are clearly of greater than *de minimis* value. Here the tangible property taken was not only substantially greater in scale than the single sheets of paper at issue in the two *de minimis* cases, but was also the sole physical embodiment of valuable information about member preferences, information that was costly to produce and would be at least as costly to recreate. That this information was of more than *de minimis* value to the union is made clear by the organization's willingness to commit substantial resources to gathering it: as detailed in the indictment,

the merger election involved the printing, national distribution, collection, and processing of thousands of official ballots at significant union expense. Cf. *Carpenter*, 484 U.S. at 26, 108 S.Ct. at 320–21 (noting that efforts spent to generate and compile business information support the claim of a property interest in that information). The defendants' alleged theft, alteration, and destruction of some of those ballots invalidated the entire enterprise and undid the union's investment. Indeed, even if it were actually proven at trial that the defendants tampered with fewer ballots than necessary to turn the election, the theft would nevertheless undermine the election's credibility—and thus the value of the union's entire investment in the process—if accompanied by evidence of a risk of broader wrongdoing.

By contrast, in *Schwartz* and *Granberry*, the fraudulently obtained permits were merely "document[s] designed to formalize the government's regulation," *Schwartz*, 924 F.2d at 417, or "the expression of [the government's] regulatory imprimatur," *id.* at 418. In both cases, as soon as the fraud was discovered, the victim institution could fully protect its interest (so far as appears) simply by issuing another piece of paper—a revocation or cancellation. Thus in *Schwartz* and *Granberry* the papers were of expressive importance only, visible signs of a change in juridical status.

The defendants contend that the voting information embodied in the ballots is valuable only because of the union's interest in democratic self-governance, and thus (leaving aside the possible distinctions between unions and governments, which we do not address) it collapses into the political rights found inadequate in *McNally*. But the argument confuses means and ends. A piece of property does not lose its status as such, nor is its value any less substantial, simply because it is held for ends that are abstract and

**2.** See *Bucuvalas* and *Martinez, supra; Borre v. United States*, 940 F.2d 215, 220–21 (7th Cir. 1991) (finding government property interest in cable television franchises); *Frank v. United States*, 914 F.2d 828, 833 (7th Cir.1990) (same for driver's licenses); but cf. *United States v. Kato*, 878 F.2d 267, 269 (9th Cir.1989) (finding no government property interest in rights con-

veyed by pilot licenses, but explicitly avoiding consideration of theory that paper certificates themselves could be property); *Toulabi v. United States*, 875 F.2d 122, 125–26 (7th Cir.1989) (government has regulatory, not property, interest in taxi licensing scheme); *United States v. Murphy*, 836 F.2d 248, 252–53 (6th Cir.1988) (no property interest in state bingo licenses).

that thereby seem non-property-like. The physical building and records of a church, for example, are no less the property of the congregation just because they are used in pursuit of religious goals. Once it has been shown that property has value to its owner (evidenced in this case by the owner's commitment of substantial resources to its creation), the property owner's ultimate goals are irrelevant.

Defendants' counsel suggested at oral argument that the ballots must be of *de minimis* value because there was no market for them. While market demand is an excellent indicator of value, it is not the only one. A costly church designed to satisfy unique ecclesiastical criteria would have material value—as evidenced by the investment in its construction—even though its design rendered it useless to all but the owners.

Also at oral argument, defendants' counsel appeared to concede that the information gathered in the merger referendum was of significant value to the union, but countered that the indictment had alleged the theft of the physical ballots only (that is, just the paper and ink) and not the information contained thereon. This argument is meritless. The mail fraud counts incorporated by reference the opening paragraphs of the indictment, which discuss both the purposes of the referendum and the procedures followed. These paragraphs express a government claim that the ballots, far from being mere random pieces of used paper, were conduits for (and necessarily encompassed) valuable information about member preferences. While the indictment may not have spelled out its legal theory with the highest degree of logical precision, it adequately stated "the essential facts," *United States v. Edmond,* 924 F.2d 261, 269 (D.C.Cir.1991), and there is no requirement that the government set out its full "theory of proof" in the indictment, *id.*

\*　　\*　　\*

We therefore find that ¶ 88(a) of the indictment articulates a legally adequate theory for the two counts of mail fraud stemming from the alleged irregularities in the conduct of the 1988 merger referendum. We express no opinion as to the nature of the union-governance rights described in indictment ¶ 88(b). We reverse the district court's order, remand the case, and instruct the court to reinstate the third and fourth counts of the indictment.

*So ordered.*