**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Michael Bryant BRUMLEY,
Defendant–Appellant.**

No. 94–40560.

United States Court of Appeals,
Fifth Circuit.

March 28, 1996.

George Michael Jamail, Bernsen, Jamail, Hartley & Goodson, Beaumont, TX, for appellant.

Traci L. Kenner, Carol K. Johnson, L. Stuart Platt, Asst. U.S. Attys., Tyler, TX, Mike Bradford, U.S. Atty., Beaumont, TX, for appellee.

Before WOOD[1], JOLLY and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge,

Michael Brumley appeals his conviction at a bench trial on three counts of wire fraud, three counts of money laundering and one count of conspiracy to commit mail fraud and wire fraud. Brumley does not appeal his conviction on two counts of making false statements to a financial institution, but he appeals his sentence. The opinion in this case issued under date of July 18, 1995, is withdrawn. We pretermit resolution of the claim of evidentiary insufficiency by Brumley since we have concluded on rehearing that a more fundamental defect exists as to counts 1–7 of the conviction, i.e. the statutes in question (18 U.S.C. §§ 1343 and 1346)[2] do not proscribe the conduct described in these counts of the indictment. We affirm as to the two counts of making false statements to a financial institution[3] and vacate the judgment of conviction on the wire fraud, mail fraud, money laundering and conspiracy counts and remand for dismissal of the indictments as to these counts.

## BACKGROUND

Brumley began working for the Texas Industrial Accident Board (IAB) in July, 1976, as a pre-hearing examiner. In July 1988 he was promoted to the position of regional director for the Houston area. As part of the state's new workers' compensation law, the IAB was re-organized in 1990 as the Texas Workers' Compensation Commission (TWCC) and Brumley was appointed the TWCC's regional associate director (essentially the same position he had held with the IAB). Beginning in 1982, Brumley solicited and accepted approximately $40,000 in loans from local attorneys, which he admitted was a violation of IAB ethical guidelines.

Between 1987 and 1992, Brumley also accepted over $86,000 in "loans" via wire transfers from another local attorney, John Cely. Although Cely understood that the money would never be repaid, he continued to make loans to Brumley. Cely wired the money from the Western Union office in Lufkin, Texas, to Brumley in Beaumont, Texas.

The procedure for making the Western Union wire transfers involved Cely, or one of his employees, filling out a form listing the recipient and the amount of the transfer. Cely paid for the wire transfer with checks payable to H.C. Walker, the Lufkin Western Union franchisee. The Western Union agent then, through a personal computer, dialled into Western Union's main computer in Bridgeton, Missouri. The Western Union agent would write a unique ten-digit number, which he obtained through the computer in Missouri, on the back of the form he gave to Cely. This would serve as the receipt. Brumley was then immediately able to pick up the money.

---

1. Circuit Judge of the Seventh Circuit, sitting by designation.

2. 18 U.S.C. § 1343 provides:

   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both. 18 U.S.C. § 1346 provides:

   For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

3. Brumley was sentenced to 24 months in prison for each of the two counts of making false statements to a financial institution, to be served concurrently.

After being notified that a money transfer was waiting for him, Brumley would go to a Western Union office in Beaumont to pick up the transfer. He would fill out a form identifying himself as the recipient and the Beaumont Western Union agent would call the Western Union computer in Bridgeton, Missouri, to verify the information. Brumley was then given a check for the amount of the transfer, which he would cash at either a bank or a grocery store.

In 1988, pursuant to a complaint from one of Cely's clients, the IAB began an investigation into Cely's law practice. Brumley on several occasions urged the IAB to reconsider its decision to formally investigate Cely, and Brumley assisted Cely in altering subpoenaed documents. Finally, Brumley aided Cely's efforts to lease TWCC property in Lufkin. The lease, if it had been consummated, would have violated ethical guidelines, as Cely practiced before the TWCC. Nevertheless, Brumley directed that the building specifications be faxed to Cely's office in the name of one of Cely's clients, James Fredregill. A TWCC employee later mailed the lease specifications to Fredregill. The property was ultimately leased to a disinterested party.

Michael Brumley was indicted in November 1993 for conspiracy to defraud the citizens of the state of Texas of the honest use of his services via mail and wire communications (18 U.S.C. § 371), wire fraud (18 U.S.C. §§ 1343, 1346), money laundering (18 U.S.C. § 1956) and making false statements to a financial institution (18 U.S.C. § 1014). Both before and during his bench trial Brumley moved to dismiss counts 1–7 of the indictment on grounds that (1) such counts "constitute an unwarranted and impermissible federal intrusion into affairs of the Texas Industrial Accident Board;" (2) the Tenth Amendment to the United States Constitution "reserves all rights to the State not specifically entrusted to the Federal Government;" and (3) that prosecution of Brumley under these counts "would violate his right of equal protection of law under the 14th Amendment" and would violate "the 7th Amendment prohibiting the infliction of cruel and unusual punishment" in that any culpable conduct under state law would only be a misdemeanor while such conduct would be punishable as a felony under the United States statutes. The trial judge overruled such motions and convicted Brumley on all nine counts in the indictment and he was sentenced to 48 months in prison. Brumley now appeals.

## McNALLY AND CARPENTER

We must start with a thorough understanding of the Supreme Court's landmark decision in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). This case involved the prosecution of a former public official of Kentucky and a private individual for alleged violation of the federal mail fraud statute, 18 U.S.C. § 1341. The principal theory of the prosecution in *McNally*, which was accepted by the courts below, was that the defendants' participation in a self-dealing patronage scheme defrauded the citizens and government of Kentucky of certain "intangible rights," such as the right to have the commonwealth affairs conducted honestly. The jury convicted defendants and the Court of Appeals affirmed the convictions, relying upon a line of decision from the Courts of Appeals holding that the mail fraud statute proscribe schemes to defraud citizens of their intangible rights to honest and impartial government. The Supreme Court granted certiorari and reversed. The most illuminating language of the majority opinion is that found at page 360 of 483 U.S., and the top of page 2882 of 107 S.Ct. which reads:

> Rather than construe the statute [mail fraud, § 1341] in a manner that leaves its outer boundaries ambiguous and *involves the Federal Government in setting standards of disclosure and good government for local and state officials,* we read § 1341 as limited in scope to the protection of property rights. If Congress desires to go further, *it must speak more clearly than it has.* (emphasis added)

This seven to two majority opinion overturned the theories upon which a large number of prior circuit court decisions had been based. Justice Stevens' dissent identifies in detail the prior circuit court cases and categorizes them in separate footnotes as follows:

Footnote 1, page 362–63, 107 S.Ct. page 2883

State and federal officials convicted of defrauding citizens of their right to the honest services of their governmental officials;

Footnote 2, page 363, 107 S.Ct. page 2883

Elected officials and campaign workers convicted of mail fraud for using the mail to falsify votes, thus defrauding the citizenry of its right to an honest election;

Footnote 3, page 363–64, 107 S.Ct. page 2883–84

In the private sector, agents with clear fiduciary duty to their employers or unions, found guilty of defrauding by accepting kick backs or selling confidential information; and

Footnote 4, page 364, 107 S.Ct. page 2884

In the private sector, defendants convicted for defrauding individuals of their rights to privacy and other non-monetary rights.

The key language from *McNally* quoted above clearly states that the majority overruled the body of case law referred to in Justice Stevens' footnotes for two reasons:

1. The majority did not want to construe the statute as involving the federal government in setting standards of disclosure and good government for local and state officials. This is a healthy recognition of the realities of our federal system and pulls the rug out from under the conceptual analysis used by the circuit courts in deciding the cases in footnotes 1 and 2 of the dissent; and

2. The majority did not want to construe the mail fraud statute in a manner that would create ambiguity in its outer limits, so it said the statute would apply only to the "protection of property rights," thereby pulling the rug out from under the category of cases described in footnotes 3 and 4.

Both the majority opinion and the dissent in *McNally* indicate that Congress might change the Court's construction; but the majority made it absolutely clear that Congress "must speak more clearly than it has" if it desired to make such changes.

Shortly after its decision in *McNally*, the Supreme Court decided *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). In *Carpenter*, a unanimous Supreme Court described their holding in *McNally* as follows:

We held in McNally that the mail fraud statute does not reach "schemes to defraud citizens of their intangible rights to honest and impartial government" and that the statute is "limited in scope to the protection of property rights."

*Id.* at 25, 108 S.Ct. at 320 (internal citations omitted).

In *Carpenter* the Supreme Court found that the property rights, though intangible (i.e. right of an employer to make exclusive use of confidential information generated by its employees), were none the less property rights and that "*McNally* did not limit the scope of § 1341 to tangible as distinguished from intangible property rights." Furthermore, in *Carpenter*, the Court characterized an employer's contractual right to an employee's honest and faithful service as "an interest too ethereal in itself to fall within the protection of the mail fraud statute." *Id.* Therefore, *Carpenter* clearly reaffirms the majority opinion in *McNally* and simply recognizes that both tangible and intangible property rights are protected by the mail fraud and wire fraud statutes.

## PASSAGE OF § 1346

On the last day of the 100th Congress in October 1988, the Congress passed a highly publicized and much debated omnibus drug bill and attached to that bill, as one of some 30 unrelated provisions, was a provision containing the text of what has now been codified as 18 U.S.C. § 1346. (*See* Pub.L. 100–690, Title VII, § 7603(a), Nov. 18, 1988, 102 Stat. 4508.) The text of this provision was placed in the Omnibus Drug Bill on the same day as the ultimate passage of that bill and the legislative history of this provision is minimal. Therefore, our first task is to decide whether the language used by the Congress in § 1346 satisfies the admonition of the Supreme Court in *McNally* that Congress "speak more clearly than it has."

■ As with any statutory question, we begin with the language of the statute. *Kel-*

logg v. United States, (In re West Texas Marketing Corp.), 54 F.3d 1194, 1200 (5th Cir.), cert. denied, — U.S. —, 116 S.Ct. 523, 133 L.Ed.2d 430 (1995). In determining a statute's plain meaning, we assume that, absent any contrary definition, "Congress intends the words in its enactments to carry their ordinary, contemporary, common meaning." Pioneer Investment Services v. Brunswick Associates, 507 U.S. 380, 388, 113 S.Ct. 1489, 1495, 123 L.Ed.2d 74 (1993) (internal quotation marks omitted). As the Supreme Court has stated: "There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982) (internal quotation marks omitted). If the language is clear, then "the inquiry should end." United States v. Ron Pair Enterprises, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989).

■ The statute in question is one sentence in length:

> For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

18 U.S.C. § 1346. The chapter referred to is Chapter 63 of Title 18 entitled "Mail Fraud" and the term "scheme or artifice to defraud" appears in four sections: Section 1341, Mail Fraud; Section 1342, Fictitious Names or Addresses; Section 1343, Fraud by Wire, Radio or Television; and Section 1344, Bank Fraud. It should be noted that the pronoun "whoever" is the operative word used at the beginning of each of these sections. Section 1 of Title I of the United States Code relating to rules of construction, contains the following definition:

> In determining the meaning of any Act of Congress, unless the context indicates otherwise—
> "person" and "whoever" include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals; ....

We note that among the meanings of the word "whoever" in Section 1 Title I, there is nothing that could even remotely be interpreted or construed to mean "a state," "a political subdivision of a state," "a government," "a governmental agency," or "the citizens of a state as a body politic."

So if we substitute for the pronoun "whoever" its statutory definition and if we insert the definitional language of § 1346 in § 1343 (Wire Fraud), which is the relevant section involved here in Brumley, the statute would read as follows:

WHO [any person, individual, corporation, company, association, firm, partnership, society or joint stock company who], having devised or intending to devise any scheme or artifice [to deprive *another* of the intangible right of honest services (emphasis added) ]

CONDUCT transmits or causes to be transmitted by means of wire, radio or television communication in interstate or foreign commerce

WHAT any writings, signs, signals, pictures or sounds

MOTIVE for the purpose of executing such scheme or artifice; etc.

The critical question we have to answer is: To whom or what does the pronoun "another" refer? The word "another" is not defined anywhere in the United States Code. Webster's says that the first and most frequent use of "another" as a pronoun is "one more; an additional one."[4] But grammarians tell us that the word "another" when used as a pronoun is an indefinite pronoun which has no specific meaning but draws its meaning from the context in which it is used. A logical argument could be made, therefore, that the pronoun "another" as incorporated by § 1346 into § 1343 would have the same meaning as the pronoun "whoever." We are reluctant, however, to decide this issue on the basis of stacking one pronoun on another (no pun intended) and conclude that the language of § 1346 is not sufficiently clear on its face so as to eliminate the need for a look at the legislative history of the passage of § 1346.

**4.** Webster's Collegiate Dictionary, Random House, 1992.

LEGISLATIVE HISTORY

Recognizing that the word "another" may be sufficiently ambiguous to justify a review of the legislative history of the passage of § 1346, we turn to that task to see what light that history might shed on the issue of "to whom or what does the pronoun 'another' refer?" In undertaking this task, we have kept square in our minds (1) the admonition of the Supreme Court in *McNally* that "if Congress desires to go further, it must speak more clearly than it has" and (2) the fact that *Brumley* involves the very case of the federal government "setting standards of disclosure and good government for local and state officials" which the Supreme Court in *McNally* recognized as requiring "clear and definite language." In *McNally*, the Supreme Court cited *United States v. Bass*, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), which states the two policies underlying the task of construing criminal statutes passed by Congress, as follows:

A fair warning should be given to the world in language that the common world will understand of what the law intends to do if a certain line is passed. To make the warning fair so far as possible the line should be clear. . . .

There is a second principle supporting today's result: Unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance. . . .

As this court emphasized only last term in *Rewis v. United States* [401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971)], we will not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction. In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision.

*Id.* at 348–49, 92 S.Ct. at 522–23 (footnotes and cited cases omitted).

The specific text of what has become 18 U.S.C. § 1346 was inserted in the Omnibus Drug Bill on the very day that the Omnibus Drug Bill was finally passed by both the House and the Senate. The text of what is now § 1346 was never included in any bill filed in either the House of Representatives or the Senate and as a result the text of § 1346 was never referred to any committee of either the House or the Senate, was never the subject of any committee report from either the House or the Senate and was never the subject of any floor debate reported in the Congressional Record. There are *only* two items of legislative history pertinent to the text of § 1346 as actually passed. First, there are remarks on the floor of the House entered by Representative Conyers regarding various items in the Omnibus Drug Bill including the section of that bill which would add a new § 1346 to Title 18. After describing the Supreme Court decision in *McNally* and its effect on various prior federal circuit court opinions, Representative Conyers stated:

This amendment restores the mail fraud provision to where that provision was before the *McNally* decision. The amendment also applies to the wire fraud provision and precludes the *McNally* result with regard to that provision.

The amendment adds a new section to 18 U.S.C. 63 that defines the term "scheme or artifice to defraud to include a scheme or artifice to defraud another of the intangible right of honest services." Thus, it is no longer necessary to determine whether or not the scheme or artifice to defraud involved money or property. This amendment is intended merely to overturn the *McNally* decision. No other change in the law is intended.

134 Cong.Rec. H11, 108–01 (daily ed. Oct. 21, 1988).

Second, after the passage of the Omnibus Drug Bill, the Senate Judiciary Committee prepared and entered into the Congressional Record a report regarding all of the provisions in the Anti–Drug Abuse Act of 1988 which were within the jurisdiction of the Senate Judiciary Committee for the purpose of detailing "Congress' intent in enacting these provisions." Regarding the text of what is now 18 U.S.C. § 1346, this report states as follows:

Section 7603. Intangible Rights for Mail and Wire Fraud.

This section overturns the decision of *McNally v. United States* in which the Supreme Court held that the mail and wire fraud statutes protect property but not intangible rights. Under the amendment, those statutes will protect any person's intangible right to the honest services of another, including the right of the public to the honest services of public officials. The intent is to reinstate all of the pre-*McNally* case law pertaining to the mail and wire fraud statutes without change.

134 Cong.Rec. S17,360-02 (daily ed. Nov. 10, 1988).[5]

■■■ We find these items of legislative history unpersuasive for two reasons. First, and foremost, the Supreme Court has never attributed a great deal of significance to contemporaneous remarks of a sponsor of legislation. *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 118, 100 S.Ct. 2051, 2061, 64 L.Ed.2d 766 (1980); *Chrysler Corp. v. Brown*, 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979).[6] Similarly, post-enactment statements of a congressional committee are not entitled to much weight. *GTE Sylvania, Inc., supra*, at 118, 100 S.Ct. at 2061; *Weinberger v. Rossi*, 456 U.S. 25, 33–36, 102 S.Ct. 1510, 1517–18, 71 L.Ed.2d 715 (1982). Second, we know of no principle of constitutional law which contemplates that the Congress can by simple legislative fiat overrule, overturn, nullify or render ineffective a decision of the Supreme Court. Any such process would be a serious breach of the separation of powers doctrine inherent in our Constitution. Consequently, we do not give any persuasive effect to the portions of both Representative Conyers' statement and the Senate Judiciary Committee report that this new

section "restores the mail fraud provision to where that provision was before the *McNally* decision" or is intended "to reinstate all of the pre-*McNally* case law pertaining to mail and wire fraud statutes without change." Particularly in the case of a criminal statute which the Supreme Court has previously held does not extend to or reach conduct which Congress may want to make criminal, the burden is on the Congress to amend that statute so that (i) "it speaks more clearly than it has" (*McNally*); (ii) "gives fair warning to the world in language that the common world will understand" that a crime will be committed if a certain line is passed, (*Bass*); and (iii) in the area of "the sensitive relation between federal and state criminal jurisdiction," the language makes a "clear statement" which "assures that the legislature has in fact faced ... the critical matters involved" (*Bass*). We conclude that the one sentence addition accomplished by the passage of 18 U.S.C. § 1346 does not meet the test required by the Supreme Court insofar as the conduct charged to be criminal by the government in this case, i.e. the conduct of a state official alleged to constitute deprivation of the public's right to honest services or good government.

Our conclusion in this regard is bolstered by the legislative history which does show that the same Congress which passed the new 28 U.S.C. § 1346 had before it at least two other bills which expressly spoke to the subject of conduct of public officials which defraud the public of the right to good government. The first of these was H.R. 3050, 100th Cong., 1st Sess., filed July 29, 1987, which provided for the addition of a new section in Chapter 63 of Title 18 of the United States Code which would read as follows:

---

**5.** We read the phrase "including the right of the public to the honest services of public officials" in this report as pure wishful thinking. Surely the staff of the Senate Judiciary Committee knew that Section 2 of S. 2973 was rejected by the House of Representatives; *see our discussion of* S. 2973 hereinafter.

**6.** In the case of Representative Conyer's remarks, affording them *any* weight is dubious, as he voted *against* the final omnibus drug bill.

Geraldine Szott Moohr, *Mail Fraud and the Intangible Rights Doctrine: Someone to Watch Over Us*, 31 Harv.J.Leg. 153, 169 n. 69 (1994). Furthermore, we note that Representative Conyer's remarks say nothing to explain the substitution of "another" for "organization;" and say nothing about a "state" or "subdivision of a state" being deprived of "an intangible right to good, faithful and honest service;" see our discussion of S. 2973 hereinafter.

Section 1346. Definition of Defraud for Certain Sections.

As used in Sections 1341 and 1343, the term "defraud" includes the defrauding of the citizens of a body politic—

1. of their right to the conscientious, loyal, faithful, disinterested and unbiased performance of official duties by a public official thereof; or

2. of their right to have the public business conducted honestly, impartially, free from bribery, corruption, bias, dishonesty, deceit, official misconduct and fraud.

This bill was referred to the House Committee on the Judiciary but was never further acted upon.

Second, the most comprehensive vehicle by which Congress sought to change the *McNally* decision in a manner sufficient to satisfy the tests of *McNally* was Senate Bill 2793 (S. 2793), titled the "Anti–Corruption Act of 1988," which was introduced in the Senate on September 7, 1988, referred to the Judiciary Committee, reported favorably by that committee without a report, and passed later by the Senate on October 14, 1988. This bill was then sent to the House of Representatives where it was referred to the House Judiciary Committee on October 19, 1988. Concurrently with its passage by the Senate, S. 2793 was designated by a unanimous consent agreement of the Senate as one of a large number of amendments to "comprise the joint leadership package" which would be attached as amendments to H.R. 5210, the Drug Initiative Act of 1988, Omnibus, which was then before the Senate having earlier been passed by the House. H.R. 5210 (with S. 2793 included) was then passed by the Senate and sent back to the House. On October 22, 1988, the House of Representatives reconsidered H.R. 5210 with the leadership package of amendments attached in the Senate and made various amendments thereto, and then passed the revised bill. One of the amendments made by the House of Representatives was to delete the text of S. 2973 and substitute therefor the language which now appears codified as 18 U.S.C. § 1346. H.R. 5210 as then amended was sent back to the Senate who

concurred in those amendments later on October 22, 1988.

Because of the direct relevance of S. 2973 to the text of what was ultimately passed as 18 U.S.C. § 1346, we append a copy of that bill as an addendum to this opinion and point out that Section 2 of this bill (pages 1–6 of addendum) would have created a new Section 225 entitled "Public Corruption" to be inserted in Chapter 11 of Title 18 of the United States Code which makes criminal: (a) depriving or defrauding the inhabitants of a state or a political subdivision of a state of the honest services of an official or employee of such state or subdivision; and (b) depriving or defrauding the inhabitants of a state or political subdivision of a state of a fair and impartially conducted election process in any primary, runoffs, special or general election. On its face Section 2 of S. 2793 is a fairly comprehensive, articulate and clear attempt to define criminal conduct which would satisfy the requirements of *McNally* that the Congress speak "more clearly than it has" and, in the area of federal/state relations, that Congress clearly express its intention to affect such relations. If Section 2 of S. 2793 had been adopted by the House of Representatives, we would not now be charged with determining the meaning of the statute.

Section 3 of S. 2793, entitled "White Collar Crime," contemplates the addition of a new § 1346 entitled "Scheme or Artifice to Defraud" which would be added to Chapter 63 of Title 18 of the United States Code. It is apparent that Section 3 of S. 2793 is a progenitor in some respects of the text of 18 U.S.C. § 1346 which was ultimately adopted by both Houses. Change the word "organization" to "another" and put a period after the words "honest services" and you would have the text of what was ultimately passed.

There is no report in the legislative history explaining why the House of Representatives declined to accept the full text of S. 2793 as part of the omnibus Anti–Drug Act of 1988 (H.R. 5210). However, the legislative history does indicate the following facts:

A. No companion bill to S. 2793 was introduced in the House of Representatives either before or after the time when S. 2793 was introduced in the Senate. Ac-

cordingly, the earliest the House Judiciary Committee could have possibly given formal consideration to the content of S. 2793 would have been in the four day window following passage of S. 2793 by the Senate and referral to the House Judiciary Committee on October 19 and final consideration of the Omnibus Drug Bill in the House on October 22, 1988.

B. The only bill previously pending in the House of Representatives during the 100th Congress which dealt with creating a new § 1346 to define the term "defrauding" as used in the mail fraud (1341) and wire fraud (1343) statutes was H.R. 3050 referred to earlier in this opinion. The legislative record does not indicate any hearings held by the House Committee on the Judiciary on H.R. 3050 and likewise there is no indication in the legislative record that the House Judiciary Committee issued any report on this bill.

From these facts we conclude that the House of Representatives clearly refused to join the Senate in the comprehensive definition of crime involving "public corruption" as set forth in Section 2 of S. 2793.

The legislative history likewise does not reveal any express report or statement as to why the House of Representatives opted to change the word "organization" to the word "another" and put a period after the words "honest services" in the portion of Section 3 of S. 2793 which the House of Representatives retained as Section 7603 of the Omnibus Crime Bill. The word "organization" is defined in Section 18 of Title 18 as meaning "a person other than an individual." The substitution of the pronoun "another" for the noun "organization" would work some enlargement of the class of potential victims, since the word "organization" by definition does not mean individual persons. But the critical question to our inquiry here is whether simply by making this one word change the House intended to accomplish the same results that would have been accomplished if Section 2 of S. 2793 had also been adopted. We think not. Simply to pose the question is to answer it. If the House of Representatives truly agreed with the Senate that "depriving the inhabitants of a state or political subdivision of a state of the honest services of an official or employee of such state or subdivision" should become a federal crime when use was made of the mails or interstate wire, radio or television communications, then the clearest and most comprehensive way to do that (and satisfy the Supreme Court's tests in *McNally*) would be to adopt the entirety of Section 2 of S. 2793. The House of Representatives clearly refused to do that. We are not prepared, therefore, to say that the House intended that the changes made to Section 3 of S. 2793 and the adoption of that changed section would accomplish through the back door what they had decided not to do through the front door.[7]

Given this legislative history, we draw these conclusions:

1. Both the House and the Senate certainly knew how to "speak clearly and definitively" on the subject of fraud depriving the citizens of a state or political subdivision of the intangible right of good and honest government, but the House refused to do so; and

2. None of the bills containing any such express provisions received a majority vote of both houses of Congress. Instead, what was passed by both houses of Congress was a last minute, "bobtailed" compromise

---

7. Our conclusion that the House of Representatives during the 100th Congress in 1988 consciously refused to pass Section 2 of S. 2793 is corroborated by the fact that in subsequent Congresses the Senate passed and included in its version of various crime bills provisions almost verbatim the same as the provisions of Section 2 of S. 2793. *See* 135 Cong.Rec. S12,430–32 (daily ed. Oct. 3, 1989) (statement of Sen. Biden); 136 Cong.Rec. S6638–39 (daily ed. May 21, 1990) (statement of Sen. Biden); 137 Cong.Rec. S9382–83 (daily ed. July 9, 1991); 138 Cong.Rec. S.6911–12 (daily ed. May ___, 1992). None of these Senate proposals were adopted by the House of Representatives. In our view, there is clear evidence over a number of Congresses that the House of Representatives does not agree with the Senate as to the need for "public corruption" legislation. Likewise, we read the continued efforts by the Senate to introduce and pass provisions expressly dealing with "public corruption" as an indication that the Senate has at least some doubts as to the efficacy of 28 U.S.C. § 1346 as passed in 1988 to accomplish the criminalization of "conduct of public officials depriving the public of honest service or good government."

which had never been the subject of hearings in either house.

Therefore, we conclude that the wording of § 1346, (perhaps on its face but for sure when interpreted in light of the legislative history), simply does not effect a change in the portion of the *McNally* opinion which held that the mail fraud statute does not reach "schemes to defraud citizens of their intangible rights to honest and impartial government."

### SUBSEQUENT CASE LAW

In the hopes of finding some prior review of this legislative history by other courts, we have diligently searched all Supreme Court and Circuit Court cases in which § 1346 is mentioned. We find:

A. There is only one Supreme Court case which contains a mention of § 1346 and that is *West Virginia University Hospitals, Inc. v. Casey*, 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991). That mention occurs at page 1155 in the dissent of Justice Stevens where he cites the *McNally* decision and points out that it was "quickly corrected by the 100th Congress." Justice Stevens, in his dissent, accuses the majority of excessive literalism and cites *McNally* and § 1346 as an example thereof.

B. There are many circuit court cases which hold that § 1346 cannot be given any retroactive effect, including a case from the Fifth Circuit. *See United States v. Loney*, 959 F.2d 1332 (5th Cir.1992). We mention this "no retroactive effect" because the counts of the indictment in *Brumley* contain numerous allegations of "misconduct" which go back in time some six or seven years before the effective date of § 1346 which is November 18, 1988. Specifically, count 1, the conspiracy count, states that the conspiracy started "from on or about a date in 1987" and counts 2–4, the wire fraud counts, allege that the wire fraud began "on or about a date in 1982."

C. There are quite a few circuit court cases which have commented on the effect of the passage of § 1346, but these comments have occurred in cases where the alleged criminal conduct occurred before the passage of § 1346 and these comments are, therefore, dicta. Two Fifth Circuit cases that are examples of this commentary are: *United States v. Little*, 889 F.2d 1367, 1369 (5th Cir.1989); and *United States v. Holley*, 23 F.3d 902, 910 (5th Cir.1994).

D. There are two circuit court cases dealing with conduct occurring after the passage of § 1346 and involving conduct of a public official. The first is *United States v. Bryan*, 58 F.3d 933 (4th Cir.1995). The principal issue in *Bryan* was whether an indictment under § 1341 as amended by § 1346 (to deprive another of the intangible right of honest services) required proof of violation of some underlying predicate law, statute or regulation. In holding that the mail fraud statute contains no predicate violation requirement, the Fourth Circuit relied on its pre-*McNally* case law to that effect, and in footnote 1 at page 940, concluded that:

> [I]t appears that *McNally* has since been nullified by statute through Congress' enactment of 18 U.S.C. § 1346. *United States v. Dischner*, 974 F.2d 1502 (9th Cir.1992); *see also United States v. DeFries*, 43 F.3d 707 (D.C.Cir.1995); *United States v. Thomas*, 32 F.3d 418 (9th Cir.1994); *United States v. Holley*, 23 F.3d 902 (5th Cir.1994); *see also West Virginia University Hospitals, Inc. v. Casey*, 499 U.S. 83, 114, 111 S.Ct. 1138, 1155, 113 L.Ed.2d 68 (1991) (Stevens, J., dissenting).

As pointed out earlier, the comment about the passage of § 1346 in the Fifth Circuit case of *Holley* is pure dicta. The same is true for the other circuit court cases cited by the Fourth Circuit in *Bryan*, i.e. *Dischner*, 974 F.2d at 1518 n. 16; *DeFries*, 43 F.3d at 709 n. 1; and *Thomas*, 32 F.3d at 419. We think it unusual that the Fourth Circuit would rely, as authority, on the comment by Justice Stevens in his dissent in *Casey*. Also, we note the use of the term "nullified by statute" which the Fourth Circuit in *Bryan* quotes favorably from the Ninth Circuit decision in *Dischner* and which for reasons discussed earlier we decline to recognize as a viable theory. For these reasons, we do not view

the Fourth Circuit opinion in *Bryan* as persuasive authority.

The second case dealing with conduct of a public official after passage of § 1346 is *United States v. Waymer*, 55 F.3d 564 (11th Cir.1995). In this case, Waymer, who was an elected member of the Atlanta Board of Education, entered into an agreement with Allen, who provided sanitation and pest control services to all of the Atlanta public schools, under which Waymer would receive a 15% commission on all contracts with the school system. In April 1993, a superseding indictment charged Waymer with 24 counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 1346 and 11 counts of money laundering. The mail fraud counts alleged (1) a scheme to defraud the citizens of Atlanta of Waymer's honest services and (2) a scheme to defraud Allen of money and property. Waymer pleaded not guilty but the jury returned guilty verdicts on most of the mail fraud counts based on the scheme to defraud the citizens of Atlanta of Waymer's honest services. One of the issues raised by Waymer on appeal was "whether § 1346 is unconstitutionally vague or overbroad." In responding to this contention, the Circuit Court stated:

The "honest services amendment" to the mail fraud statute, 18 U.S.C.A. § 1346, allows the United States to predicate a mail fraud prosecution on a "scheme or artifice to deprive another of the intangible right of honest services." [FN3]

---

[FN3] In 1988, Congress enacted section 1346, overriding the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). *McNally* had held that the mail fraud statute did not criminalize schemes to defraud citizens of their rights to honest government. *Id.* at 359, 107 S.Ct. at 2881. Congress' purpose in enacting section 1346 was to restore the mail fraud statute to its pre-*McNally* position by allowing mail fraud convictions to be predicated on deprivations of honest services. *United States v. Martinez*, 905 F.2d 709, 715 (3rd Cir.1990).

*United States v. Waymer*, 55 F.3d at 568. With respect for the views of our colleagues on the Eleventh Circuit, we do not find their analysis of the effect of passage of § 1346 persuasive. The case of *United States v. Martinez*, 905 F.2d 709, which the

court in *Waymer* cited at the end of footnote 3 for the proposition that § 1346 was intended to restore the mail fraud statute to its pre-*McNally* position, is a terribly weak precedent for that proposition for these reasons: (i) neither of the defendants in *Martinez* were state officials or state employees; (ii) the criminal conduct in *Martinez* occurred *before* the Supreme Court decision in *McNally* and, therefore, *before* the passage of § 1346; (iii) the court in *Martinez* expressly recognized that its commentary about the passage of § 1346 was "not determinative of the issue before us" and, therefore, dicta; and (iv) the only evidence of legislative history relied upon by the court in *Martinez* was the statement of Representative Conyers referred to earlier in this opinion. Just like the Fourth Circuit in *Bryan*, the Eleventh Circuit in *Waymer* has simply relied on conclusionary dicta from other Circuit Court opinions, none of which made any effort whatsoever to evaluate the language of § 1346 itself nor the peculiar process by which § 1346 was adopted. We stand, comfortably and with some confidence as to its correctness, on the analysis of the statutory language and legislative history which we have set forth earlier.

■ In conclusion, we note again the language of the indictment in this case which alleges:

(a) *As to Count 1 (conspiracy)*

[T]o defraud by scheme and artifice the citizens of the State of Texas, including members of the Texas Industrial Accident Board (and it successor, the T.W.C.C.), an agency of the State of Texas, from receiving the intangible right to honest services;

(b) *In Counts 2–4 (wire fraud)*

[H]aving intentionally and willfully devised the scheme and artifice described in paragraphs A–1 through 23 and B–1 through 30 [which cover time periods prior to the passage of § 1346] to defraud and deprive the citizens of the State of Texas, including the Industrial Accident Board and its successor (the Texas Workers Compensation Commis-

sion), a state agency, of the intangible right to good, faithful, and honest service.

There is no allegation of any kind as to any property interest, other than the concept of "the intangible right to good, faithful, and honest service," and there is no allegation except "the citizens of the State of Texas" and "a state agency" as the entities from whom the honest services were deprived.

We do not reach the question of whether § 1346 is constitutional. If and when Congress clearly and expressly says they want to put the federal government in the business of "setting standards of disclosure and good government for local and state officials," the question of whether Congress has the power to do that would have to be faced. As we read *McNally*, the Supreme Court has left that question unanswered. Since we read § 1346 as it now exists as not reaching such conduct of state government officials, we need not address the constitutionality issue which would be posed when and if Congress speaks to expressly proscribe such conduct.

## CONSPIRACY COUNT

Brumley was convicted of one count of conspiracy to commit mail fraud and wire fraud. The essential elements of conspiracy to commit mail fraud and wire fraud, 18 U.S.C. § 371, are: (1) an agreement between two or more persons; (2) to commit interstate mail fraud or wire fraud; and (3) an overt act committed by one of the conspirators in furtherance of the conspiracy. *United States v. Hatch*, 926 F.2d 387, 393 (5th Cir.), *cert. denied*, 500 U.S. 943, 111 S.Ct. 2239, 114 L.Ed.2d 481 (1991); *United States v. Massey*, 827 F.2d 995, 1001 (5th Cir.1987); and *United States v. Gordon*, 780 F.2d 1165, 1170 (5th Cir.1986). "Conspiracy to commit a particular substantive offense cannot exist without at least the degree of criminal intent necessary for the substantive offense." *Massey*, 827 F.2d at 1001 (quoting *Ingram v. United States*, 360 U.S. 672, 678, 79 S.Ct. 1314, 1319, 3 L.Ed.2d 1503 (1959)). The conspiracy count in this case uses identically the same language as used in the substantive wire fraud counts, i.e. "to defraud by scheme and artifice the citizens of the State of Texas,

including members of the Texas Industrial Accident Board (and its successor, the TWCC), an agency of the State of Texas, from receiving the intangible right to honest services" and cites §§ 1341, 1343 and 1346. Since we have concluded earlier in this opinion that the amendatory language of § 1346 does not reach conduct of public officials in depriving a state or the citizens thereof of honest services, we hold that the conspiracy count is defective for the same reasons.

## MONEY LAUNDERING COUNTS

■ Brumley was convicted of three counts of money laundering. The money laundering statute, 18 U.S.C. § 1956, requires a financial transaction involving the proceeds of a specified unlawful activity. The term "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7)(A) to include any racketeering offense listed in 18 U.S.C. § 1961(1). One of the racketeering offenses identified in 18 U.S.C. § 1961(1) is wire fraud under 18 U.S.C. § 1343. Each of the money laundering counts against Brumley makes a cross-reference to the wire fraud counts as the "specified unlawful activity" and identifies identically the same wire transfers named in the wire fraud counts as the transactions producing the "proceeds of a specified unlawful activity". Since we have earlier concluded in this opinion that the language of § 1346 does not extend the wire fraud statute to conduct of state officials in depriving the state or the citizens thereof honest services and good government, we hold for the same reasons that the money laundering counts are defective.

## SENTENCING

Brumley raises two issues related to sentencing which only concern the wire fraud, money laundering and conspiracy to commit mail fraud and wire fraud counts. Since we have reversed Brumley's conviction as to those counts, we need not consider Brumley's sentencing issues. Brumley did not appeal his conviction on the false statements to a financial institution counts nor his sentencing under those counts.

## CONCLUSION

For the reasons stated herein, Brumley's convictions on counts 1–7 for conspiracy, wire fraud and money laundering are VACATED and the case is REMANDED to the district court for entry of an order of dismissal as to those counts. Brumley's conviction and sentence of 24 months for the two counts of making false statements to a financial institution is AFFIRMED.

ADDENDUM

100TH CONGRESS
2D SESSION

# S. 2793

To amend title 18 of the United States Code to punish corruption.

IN THE SENATE OF THE UNITED STATES

SEPTEMBER 15 (legislative day, SEPTEMBER 7), 1988

Mr. BIDEN (for himself, Mr. McCONNELL, Mr. METZENBAUM, Mr. SIMON, Mr. THURMOND, and Mr. DeCONCINI) introduced the following bill; which was read twice and referred to the Committee on the Judiciary

# A BILL

To amend title 18 of the United States Code to punish corruption.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SECTION 1. SHORT TITLE.

This Act may be cited as the "Anti-Corruption Act of 1988".

SEC. 2. OFFENSE.

Chapter 11 of title 18, United States Code, is amended by adding at the end thereof the following new section:

2

## "§ 225. Public Corruption

"(a) Whoever, in a circumstance described in subsection (c), deprives or defrauds, or attempts to deprive or to defraud, by any scheme or artifice, the inhabitants of a State or political subdivision of a State of the honest services of an official or employee of such State or subdivision, shall be fined under this title, or imprisoned for not more than ten years (or, if the defendant intended that the scheme or artifice promote conduct constituting an offense under the laws of the United States or a State for which the maximum term of imprisonment is greater than ten years, shall be imprisoned as required or authorized by the law punishing such offense or for not more than twenty years, whichever is less), or both.

"(b) Whoever, in a circumstance described in subsection (c), deprives or defrauds, or attempts to deprive or to defraud, by any scheme or artifice, the inhabitants of a State or political subdivision of a State of a fair and impartially conducted election process in any primary, run-off, special, or general election, through the procurement, casting, or tabulation of ballots or voter registration forms which are false, fictitious, fraudulent, or illegal under the laws of the State in which the election is held, or through the filing of any false, fictitious or fraudulent report required to be filed under State law regarding an election campaign, shall be fined under this title or imprisoned for not more than ten years, or both.

3

"(c) The circumstances referred to in subsections (a) and (b) are that—

"(1) for the purpose of executing or concealing such scheme or artifice or attempting to do so, the actor—

"(A) places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing;

"(B) transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce any writings, signs, signals, pictures, or sounds;

"(C) transports or causes to be transported any person or thing, or induces any person to travel in or to be transported in, interstate or foreign commerce; or

"(D) uses any facility of interstate or foreign commerce; or

4

"(2) the scheme or artifice affects in any manner or degree, or would if executed or concealed so affect, interstate or foreign commerce.

"(d) Whoever deprives or defrauds, or attempts to deprive or defraud, by any scheme or artifice, the inhabitants of the United States of the honest services of a public official or person who has been selected to be a public official shall be fined under this title or imprisoned for not more than ten years (or, if the defendant intended that the scheme or artifice promote conduct constituting an offense under the laws of the United States or a State for which the maximum term of imprisonment is greater than ten years, shall be imprisoned as required or authorized by the law punishing such offense, or for not more than twenty years, whichever is less), or both.

"(e) Whoever being an official, or public official, or person who has been selected to be a public official, directly or indirectly, discharges, demotes, suspends, threatens, harasses, or, in any manner, discriminates against any employee or official of the United States or any State or political subdivision of such State, or attempts to do so, in order to carry out or to conceal any scheme or artifice described in this section, shall be fined under this title or subject to imprisonment of up to five years or both.

5

"(i)(1) Any employee or official of the United States or any State or political subdivision of such State who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against because of lawful acts done by the employee as a result of a violation of subsection (e) or because of actions by the employee on behalf of himself or others in furtherance of a prosecution under this section (including investigation for, initiation of, testimony for, or assistance in such a prosecution) may in a civil action, obtain all relief necessary to make such individual whole. Such relief shall include reinstatement with the same seniority status such individual would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees.

"(2) An individual is not eligible for such relief if that individual participated in the violation of this section with respect to which such relief would be awarded.

"(g) For purposes of this section—

"(1) the term 'State' means a State of the United States, the District of Columbia, Puerto Rico, and any other territory or possession of the United States;

"(2) the term 'agency' means a subdivision of the executive, legislative, judicial, or other branch of gov-

6

ernment, including a department, independent establishment, commission, administration, authority, board, and bureau, and a corporation or other legal entity established and subject to control by a government or governments for the execution of a governmental or intergovernmental program;

"(3) the terms 'public official' and 'person who has been selected to be a public official' have the meaning set forth in section 201 of this title; the terms 'official', 'public official', and 'person who has been selected to be a public official' shall also include any person acting under color of official authority;

"(4) the term 'official' includes a person who has been nominated or appointed to be an official or who has been officially informed that he or she will be so nominated or appointed, and includes any official of an Indian tribal government.".

SEC. 8. WHITE COLLAR CRIME.

Chapter 63 of Title 18 of the United States Code is amended by adding a new section as follows:

"§ 1346. Scheme or artifice to defraud

"For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive an organization of the intangible right of honest services in which the defendant received or attempted to receive, for the

7

defendant or another person, anything of value or in which the defendant intended or contemplated loss or harm to the organization.".

SEC. 4. TECHNICAL AND CONFORMING AMENDMENTS.

(a) TABLE OF SECTIONS.—The table of sections for chapter 11 of title 18, United States Code, is amended by adding at the end thereof the following item:

"225. Public Corruption.".

(b) TABLE OF SECTIONS.—The table of sections for chapter 63 of title 18, United States Code, is amended by adding at the end thereof the following item:

"1348. Scheme Or Artifice To Defraud.".

(c) RICO.—Section 1961(1) of title 18, United States Code, is amended by inserting "section 225 (relating to public corruption)," after "section 224 (relating to sports bribery),".

(d) INTERRUPTION OF COMMUNICATIONS.—Section 2516(1)(c) of title 18, United States Code, is amended by inserting "section 225 (relating to public corruption)," after "section 224 (bribery in sporting contests),".

SEC. 5. INTERSTATE COMMERCE.

(a) IN GENERAL.—Section 1343 of title 18, United States Code, is amended by striking "transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds" and inserting "uses or

8

causes to be used any facility of interstate or foreign commerce".

(b) CONFORMING AMENDMENTS.—(1) The heading of section 1348 of title 18, United States Code, is amended by striking "Fraud by wire, radio, or television" and inserting "Fraud by use of facility of interstate commerce".

(2) The chapter analysis for chapter 63 of title 18, United States Code, is amended by striking the analysis for section 1348 and inserting the following:

"1348. Fraud by use of facility of interstate commerce".

O

HARLINGTON WOOD, Jr., Circuit Judge, dissenting.

Judge DeMoss for the majority has written a very thoughtful and comprehensive analysis of the statutory interpretation problem arising in this case. I view it as a close call, but after revisiting this case I cannot come to the same conclusion as the majority. Therefore, I respectfully dissent.

In view of the—albeit limited—legislative history I believe that the meaning of the term "another" should be given a broader interpretation than the one adopted by the majority. The comment of Representative Conyers and the Senate Judiciary Committee report are in agreement. Both legislative expressions explain that § 1346 was intended to "overturn" *McNally*. Congress unquestionably has the right to change the statutes which it has enacted. It is also significant that there are no expressed legislative comments to the contrary. Congress perhaps could have been more precise, but what Congress did I view as sufficient considering both the language of the statute itself and the accompanying explanations. In any event, I do not believe the majority succeeds in advancing its own restrictive analysis by merely discounting this legislative history.

By enacting § 1346, Congress expressly extended the reach of the wire fraud statute to "include[ ] a scheme or artifice to deprive another of the intangible right of honest services." I agree with the majority that the term "another" should be given its ordinary meaning and that the most common usage of "another" as a pronoun is "an additional one" or "one more." Under my ordinary reading of § 1346, however, "another" can easily be read to refer to a state citizen where the perpetrator of the fraud is a governmental official acting in his or her official capacity. Therefore, in light of my less restrictive reading of "another," I conclude that § 1343, as amended by § 1346, does reach Brumley's illegal conduct. I believe the Fourth and Eleventh Circuits were correct in *Bryan* and *Waymer* so I would not totally discount those decisions. Through this amendment Congress extended the protection offered to interstate wire facilities in order to prevent these facilities from being burdened and polluted by fraudulent schemes which are designed to deprive another of the non-proprietary right of honest services.

The indictment charges Brumley with a continuing offense that both precedes and follows the effective date of § 1346. While the indictment may therefore be technically flawed, this circuit has previously held that a similar error was not sufficient to invalidate a conviction. *See United States v. Wells Fargo Armored Serv. Corp.*, 587 F.2d 782, 783 (5th Cir.1979) (holding that the indictment's failure to delineate *any* overt acts after the date when the offense in question was made a felony did not violate the Constitution's prohibition against ex post facto laws).

This short dissent I believe sufficiently expresses my general view of the problem. In *McNally*, the Supreme Court stated: "[W]e read § 1341 as limited in scope to the protection of property rights. If Congress desires to go further, it must speak more clearly than it has." 483 U.S. at 360, 107 S.Ct. at 2882. By that language the Supreme Court advised Congress it could do exactly what it has now done. In view, therefore, of what Congress both did and said I would not frustrate its latest efforts. It passed § 1346 which extended the protection of the relevant fraud statute beyond the limits of tangible and intangible property rights to expressly include "the intangible right of honest services," a right which can be as important as a property right.

I would affirm the district court in all respects.