United States Court of Appeals, Eleventh Circuit.

No. 93-9319.

UNITED STATES of America, Plaintiff-Appellee,

v.

Robert W. WAYMER, Defendant-Appellant.

June 16, 1995.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:92-CR-349), Robert H. Hall, Judge.

Before HATCHETT and COX, Circuit Judges, and JOHNSON, Senior Circuit Judge.

JOHNSON, Senior Circuit Judge:

In this appeal from the Northern District of Georgia, Robert W. Waymer seeks reversal of his convictions on twenty-two counts of mail fraud and eleven counts of money laundering. For the reasons stated below, we affirm.

## I. STATEMENT OF THE CASE

A. *Factual Background*

Waymer was an elected member of the Atlanta Board of Education ("the Board"). Buddy Allen was the President and General Manager of Allen Service Company, the parent to several companies, including Peatross Service Company. John Assmar was a real estate broker.

In 1986, Allen agreed to pay Assmar fifteen percent of the gross proceeds of any service contracts Assmar obtained on behalf of Allen's companies. In 1986, Assmar, acting on behalf of Peatross, began a pilot sanitation and pest control program for two Atlanta public schools. By the 1988-89 school year, Allen's companies provided pest control and other services to all 113

Atlanta public schools.

In mid-1988, Assmar died.  Shortly thereafter, Allen paid more than $30,000 to Assmar's widow as Assmar's commission for the remainder of 1988.  Although this commission grew out of Assmar's role in obtaining Allen's contracts with the school system, by the time of Assmar's death, he was doing virtually nothing to assist in the performance of the contracts.

After Assmar's death, but prior to the end of 1988, Waymer approached Allen and told him that he and Assmar had been partners and that he wanted to assume Assmar's role in Allen's school system contracts.  Allen responded that he had already paid Assmar's widow the fifteen percent commission for 1988.  Waymer approached Allen again at the end of 1988.  At that time, Allen agreed to pay Waymer the fifteen percent if Waymer provided him with an assurance from the school system that Waymer could do business with Allen at the same time that he was a member of the Board.

Waymer told Dr. Woodrow Wilson, the Associate Superintendent of the Atlanta school system, that he was considering doing business with someone who did business with the school system and asked his advice.  Because Waymer was in the real estate business, Wilson assumed Waymer was talking about real estate work.  He advised Waymer that it was allowable if the other party's business with the school system was accomplished through a sealed bid procedure.  Wilson further advised Waymer to abstain if matters came before the Board involving that business and to disclose the relationship to the Board and Superintendent.  Waymer then wrote Wilson a letter stating that he was engaged in real estate and

marketing activities with Allen, that Waymer had done consulting work for Allen since 1986, and that Waymer would make full disclosure of his relationship with Allen.  Waymer's letter did not inform Wilson that Allen would be paying Waymer fifteen percent of Allen's companies' proceeds from the contract with the school system and that Waymer would be required to perform almost no services for Allen in order to receive the payments.  Neither Waymer nor Wilson took the matter before the entire Board.

From the beginning of 1989 to the end of 1991, Allen paid Waymer by checks made payable to Elloree Real Estate Company.  All of the checks were deposited into the Elloree business account. Each time Waymer deposited a check from Allen's companies into the Elloree account, he wrote one or more checks on that account to himself and deposited the money in his personal account.  In all, Allen paid Waymer more than $200,000.

B. *Procedural History*

In April 1993, a superseding indictment charged Waymer with twenty-four counts of mail fraud, in violation of 18 U.S.C.A. §§ 1341 (West 1984 and Supp.1994) and 1346 (West Supp.1994), and eleven counts of money laundering, in violation of 18 U.S.C.A. § 1956(a)(1)(B)(i) (West Supp.1994).  The mail fraud counts alleged (1) a scheme to defraud the citizens of Atlanta of Waymer's honest services and (2) a scheme to defraud Allen of money and property. The money laundering counts relied upon the mail fraud counts as the specified unlawful activity constituting the source of the laundered proceeds.  Waymer pleaded not guilty.

At the trial, which commenced in July 1993, the court granted

a motion for judgment of acquittal on two of the mail fraud counts. The jury returned guilty verdicts on all remaining mail fraud counts based on the scheme to defraud the citizens of Atlanta of Waymer's honest services.[1] Waymer was also convicted on all money laundering counts. He was sentenced to concurrent terms of thirty-three months' imprisonment.

Waymer raises the following issues on appeal: (1) whether section 1346 is unconstitutionally vague or overbroad; (2) whether the school system's mailing of checks to Allen's companies satisfies the mailing requirement of section 1341; (3) whether the evidence was sufficient to establish mailing of the twenty-two checks at issue; and (4) whether the fact that Waymer was being paid fifteen percent of the proceeds of Allen's companies' contracts with the Board was "material."[2]

## II. DISCUSSION

A. *Vagueness and overbreadth challenges to section 1346*

Federal law prohibits the use of the mails in furtherance of a scheme to defraud. 18 U.S.C.A. § 1341. To prove mail fraud, the government must show that the accused (1) intentionally participated in a scheme or artifice to defraud and (2) used the United States mails to carry out that scheme or artifice. *United States v. Hooshmand,* 931 F.2d 725, 731 (11th Cir.1991). The

[1]The jury was deadlocked on Waymer's guilt regarding the alleged scheme to defraud Allen of money and property.

[2]In addition to those listed above, Waymer raises numerous other issues. After careful review of the record, we conclude that Waymer's contentions regarding those other issues are without merit and do not warrant discussion. Accordingly, we summarily affirm the district court as to all issues not herein discussed.

"honest services amendment" to the mail fraud statute, 18 U.S.C.A. § 1346, allows the United States to predicate a mail fraud prosecution on a "scheme or artifice to deprive another of the intangible right of honest services."[3] Waymer contends that section 1346 is unconstitutionally vague and overbroad. Our review is *de novo.*

1. *Vagueness*

Because "honest services" are not defined in the mail fraud statute, Waymer contends that section 1346 is unconstitutionally vague. A statute is not unconstitutionally vague if it "define[s] the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). Waymer's void-for-vagueness challenge to section 1346 does not involve the First Amendment; therefore, we review section 1346 only as applied in the instant case. *United States v. Awan,* 966 F.2d 1415, 1424 (11th Cir.1992). In other words, we need only examine the vagueness of the statute in light of the particular facts of this case. *Id.*

The constitutionality of a vague statutory standard is

---

[3]In 1988, Congress enacted section 1346, overriding the Supreme Court's decision in *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). *McNally* had held that the mail fraud statute did not criminalize schemes to defraud citizens of their rights to honest government. *Id.* at 359, 107 S.Ct. at 2881. Congress' purpose in enacting section 1346 was to restore the mail fraud statute to its pre-*McNally* position by allowing mail fraud convictions to be predicated on deprivations of honest services. *United States v. Martinez,* 905 F.2d 709, 715 (3rd Cir.1990).

closely related to whether the standard incorporates a requirement of *mens rea*. *Colautti v. Franklin,* 439 U.S. 379, 395, 99 S.Ct. 675, 685, 58 L.Ed.2d 596 (1979). "A statutory requirement that an act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain. But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware." *United States v. Conner,* 752 F.2d 566, 574 (11th Cir.) (quoting *Screws v. United States,* 325 U.S. 91, 101-02, 65 S.Ct. 1031, 1035-36, 89 L.Ed. 1495 (1945) (Douglas, J., concurring)), *cert. denied sub nom., Taylor v. United States,* 474 U.S. 821, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985); *see also United States v. Margiotta,* 688 F.2d 108, 129 (2d Cir.1982) ("[t]he broad language of [section 1341], intended by Congress to be sufficiently flexible to cover the wide range of fraudulent schemes mankind is capable of devising, is not unconstitutionally vague because section 1341 contains the requirement that the defendant must have acted willfully and with a specific intent to defraud."), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983).

Applying that principle to this case, we note that to convict a person of mail fraud, the government must prove specific intent to defraud. 18 U.S.C.A. § 1341 (West Supp.1994). *Hooshmand,* 931 F.2d at 732. Here, the jury found that Waymer specifically intended to commit a fraud on Atlanta's citizens. Waymer does not maintain that the jury was improperly instructed as to specific intent. Nor does he argue that the evidence was insufficient to support the jury's conclusion that he specifically intended to

defraud the citizens of Atlanta of his honest services. Therefore, his vagueness challenge must fail. Accordingly, we hold that the term "honest services" in section 1346, as applied to Waymer, is not unconstitutionally vague.

2. *Overbreadth*

Waymer contends that section 1346 could be used to prosecute expression protected by the First Amendment and, thus, is facially overbroad. Application of the overbreadth doctrine is employed as a last resort and is not to be invoked when a limiting construction has been or could be placed on the challenged statute. *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). In cases like this one, where the statute at issue regulates conduct and not merely speech, the statute will not be struck down unless its overbreadth is "not only real, but also substantial in relation to the statute's plainly legitimate sweep." *Id.* If a conduct-regulating statute reflects legitimate governmental interests and is not substantially overbroad, whatever overbreadth does exist should be cured on a case-by-case basis. *Id.*

We see no basis for facial invalidation of section 1346 on overbreadth grounds. Section 1346 effectuates the legitimate governmental aim of punishing those who use the mails to carry out fraudulent schemes to deprive others of their intangible rights to honest services. Assuming *arguendo* that certain marginal applications of section 1346 would impermissibly intrude on First Amendment rights, we hold that such potential problems with section 1346 are insubstantial when judged in relation to the statute's

plainly legitimate sweep. Thus, defects in the honest services amendment to the mail fraud statute can be effectively addressed on a case-by-case basis. Accordingly, section 1346 is not facially overbroad.

B. *The Mailing Requirement*

The federal mail fraud statute does not purport to reach all frauds; rather, it aims at instances where the use of the mails is "part of the execution of the fraud." *Schmuck v. United States,* 489 U.S. 705, 710, 109 S.Ct. 1443, 1447, 103 L.Ed.2d 734 (1989) (quoting *Kann v. United States,* 323 U.S. 88, 95, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944)). Thus, "mailing" is a required element of the crime of mail fraud. To satisfy the mailing requirement, however, the use of the mails need not be an essential element of the scheme. *Schmuck,* 489 U.S. at 710, 109 S.Ct. at 1447. It is sufficient for the mailing to be "incident to an essential part of the scheme" or "a step in the plot." *Id.* at 711, 109 S.Ct. at 1448 (quoting *Badders v. United States,* 240 U.S. 391, 394, 36 S.Ct. 367, 368, 60 L.Ed. 706 (1916)).

1. *Payment of a Lawful Debt*

In this case, the government met the mailing requirement by showing that the Board's payments to Allen's companies were accomplished by use of the mails. Waymer contends that because the school system had a legal obligation to pay Allen, the mailing of checks in payment of that legal debt cannot satisfy the mailing requirement.

Waymer's contention is foreclosed by the Supreme Court's decision in *Schmuck,* which expressly rejected the claim that a

routine or innocent mailing cannot supply the mailing element of the mail fraud offense. 489 U.S. at 714-15, 109 S.Ct. at 1449-50 (1988). *Schmuck* involved a scheme whereby the defendant would purchase used cars, roll back their odometers, and sell them to dealers for inflated prices. The dealers, in turn, would sell the cars to consumers for prices which reflected the earlier fraud. In order to complete the resale transactions between the dealers and the consumers, title had to be transferred to the consumers; this was accomplished by mailing a title application form to the Wisconsin Department of Transportation.

The Supreme Court held that although it was an innocent act in itself, the mailing of the title applications supplied the mailing element for the defendant's mail fraud conviction. The Court wrote:

> Under these circumstances, we believe that a rational jury could have found that the title-registration mailings were part of the execution of the fraudulent scheme, a scheme which did not reach fruition until the retail dealers resold the cars and effected transfers of title. Schmuck's scheme would have come to an abrupt halt if the dealers either had lost faith in Schmuck or had not been able to resell the cars obtained from him. These resales and Schmuck's relationships with the retail dealers naturally depended on the successful passage of title among the various parties. Thus, although the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme.

*Id.* at 712, 109 S.Ct. at 1448.

This case presents an even stronger factual scenario for finding mailing than did *Schmuck.* In *Schmuck,* despite the fact that the mailing took place *after* the defendant had already received the desired benefit from his fraud, the Supreme Court held that the mailings were in furtherance of his *overall* fraudulent

scheme.  Here, by contrast, the checks mailed to Allen were the very source of the payments to Waymer.  Unless and until Allen got paid, Waymer could not get paid.[4]  In short, because the success of Waymer's scheme to defraud Atlanta's citizens directly depended on Allen's being paid, and because Allen was paid by mail, the mailings in this case satisfy the mailing requirement of section 1341.

2. *Sufficiency of the Evidence of Mailing*

Waymer next contends that there was insufficient evidence to conclude that the twenty-two checks at issue in this case were, in fact, mailed from the school system to Allen.  We review challenges to the sufficiency of the evidence *de novo.  Hooshmand,* 931 F.2d at 733.  In so doing, we review the evidence, including all reasonable inferences and credibility choices, in the light most favorable to the government and decide whether a reasonable factfinder could

[4]*Cf. United States v. Maze,* 414 U.S. 395, 402, 94 S.Ct. 645, 649, 38 L.Ed.2d 603 (1974) (no mail fraud despite foreseeable mailing of bills to credit card owner, because defendant's fraudulent scheme was complete when he used the stolen credit card to receive the object of the fraud); *Parr v. United States,* 363 U.S. 370, 393, 80 S.Ct. 1171, 1184, 4 L.Ed.2d 1277 (1960) (defendant who made unauthorized use of school district's credit card did not commit mail fraud, despite the fact that the oil company which issued the credit card mailed the invoices to the school district for payment); *Kann,* 323 U.S. at 94, 65 S.Ct. at 150 (mailing requirement was not met where defendants cashed fraudulently obtained checks at local bank and local bank then mailed checks to drawee banks for collection;  "it was immaterial to [the defendants], or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank").  As this Court has noted, "if a defendant has been able to take possession of the object of the fraud and if the fraud is then at an end, further mailings "involve[ ] little more than post-fraud accounting among the potential victims of the various schemes, and the long-term success of the fraud [does] not turn on which of the potential victims [bears] the ultimate loss.' "  *United States v. Smith,* 934 F.2d 270, 272 (11th Cir.1991) (quoting *Schmuck,* 489 U.S. at 714, 109 S.Ct. at 1449).

find guilt beyond a reasonable doubt. *Id.* We need not rule out every hypothesis of innocence; a jury is free to choose among reasonable constructions of the evidence. *Id.*

The Atlanta school system paid Allen's companies for his services out of two accounts, the general fund and the cafeteria account. Larry Washington and Mary Bright each supervised one of these accounts. Both testified that the customary practice was for the school system to mail checks to vendors. However, Washington testified that on three or four occasions between 1986 and 1992, checks drawn on the general fund were picked up personally by someone from Allen's companies. Bright testified that 20% of the time preceding the last year and 50% of the time in the last year, checks from the cafeteria account were picked up rather than mailed. Bright and Washington further testified that their approval was required for checks to be picked up, but that they kept no records of which checks were mailed and which were picked up.

Mailing can be proved through circumstantial evidence. *United States v. Metallo,* 908 F.2d 795, 798 (11th Cir.1990), *cert. denied,* 503 U.S. 940, 112 S.Ct. 1483, 117 L.Ed.2d 625 (1992). Proof of a routine practice of using the mail to accomplish a business end is sufficient to support a jury's determination that mailing occurred in a particular instance. *Id.* This Court has not previously addressed the issue of whether significant deviations from a claimed routine practice of mailing render the evidence insufficient to support a finding of mailing in a particular instance. However, the Fifth Circuit has written:

> Where, for example, the usual business practice includes the frequent use of private couriers ... the inference that the ... mails ... were employed in executing the fraud is cast into serious doubt.  Absent other probative evidence to show that a mailing ... occurred ... a jury cannot reasonably overcome the presumption of innocence.

*United States v. Moody,* 903 F.2d 321, 332 (5th Cir.1990).

In this case, we need not decide whether the testimony of Bright and Washington, standing alone, would be sufficient to establish that the checks at issue were mailed, because the government presented additional evidence of mailing.  Specifically, the government offered proof of more than four days' delay between the date that each of the twenty-two checks at issue was cut by the school system and the date that the same check was deposited into one of Allen's companies' accounts.[5]  The record contains evidence which shows that the school system normally would write a check on one day and then mail it on the next.  Allen testified that his customary practice was to deposit checks soon after they were received because "we are a small company and our funds are needed in other areas."  The Fifth Circuit has held that time delay evidence is probative of the method of transport and that three or four days' time delay is in accordance with the ordinary degree of postal efficiency.  *Moody,* 903 F.2d at 332-33.  We agree with the Fifth Circuit.  Such evidence supports an inference of mailing.

Viewed in the light most favorable to the government, the evidence in this case was sufficient to support the finding of mailing.  Taken together, the following evidence supports the

---

[5]The original indictment charged forty-six counts of mail fraud, but the superseding indictment charged only twenty-four. The charges that were dropped were for checks for which the delay was four days or less.

jury's conclusion: (1) evidence of the school system's sometimes-broken custom of mailing checks to Allen's companies; (2) testimony regarding the school system's practice of cutting a check on one day and mailing it on the next; (3) Allen's testimony that his companies typically deposited checks as soon as they were received; and (4) evidence that there were more than four days' delay between the date of the school system's cutting and the date of Allen's companies' depositing the twenty-two checks at issue in this case. Accordingly, we hold that the evidence was sufficient for the jury to decide beyond a reasonable doubt that the twenty-two checks at issue in this case were mailed.

C. *Materiality of the Undisclosed Information*

A defendant's breach of a fiduciary duty may be a predicate for a violation of the mail fraud statute where the breach entails the violation of a duty to disclose material information. *Margiotta,* 688 F.2d at 127-28. In other words, "[f]raud, for purposes of a mail fraud conviction, may be proved through the defendant's non-action or non-disclosure of material facts intended to create a false and fraudulent representation." *United States v. O'Malley,* 707 F.2d 1240, 1247 (11th Cir.1983). An affirmative duty to disclose need not be explicitly imposed; it may instead be implicit in the relationship between the parties. *Margiotta,* 688 F.2d at 128. *See also United States v. Silvano,* 812 F.2d 754, 759 (1st Cir.1987) ("[T]he affirmative duty to disclose material information arises out of a government official's fiduciary relationship to his or her employer, whether as a public or as a private employee.").

Waymer contends that his general fiduciary duty to the citizens of Atlanta did not require him to disclose that he was receiving fifteen percent of the proceeds from Allen's companies' contracts with the Atlanta school system and that he performed virtually no services in exchange for those payments. In other words, he maintains that the information he withheld was not material. Waymer correctly asserts that this is not a case of a fiduciary's complete failure to disclose. He also rightly points out that when he consulted with Wilson about his plans to have a "business relationship" with Allen, Wilson assumed that the relationship would involve compensation of some sort. On the basis of these facts, Waymer contends that what he failed to disclose were minor details concerning how that compensation was to be calculated. We cannot agree.

For a School Board member to be receiving a direct and substantial cut from a vendor's contract with the school system in exchange for the performance of virtually no services so obviously smacks of impropriety that it can hardly be characterized as a minor detail of which the Board need not be apprised. The fact that Allen's companies could afford to pay Waymer—who did nothing to help Allen procure or retain the school board contracts and virtually nothing to help Allen perform on those contracts—fifteen percent of the proceeds of the contracts strongly suggests that there were at least fifteen percent of unnecessary expenses in Allen's bids for the contracts. Had the Board known this, it likely would have re-bid the contracts at a considerable savings to the citizens of Atlanta. Accordingly, we find no merit in Waymer's

contention that as a fiduciary to the citizens of Atlanta, he had no duty to disclose the fact that he was receiving fifteen percent of what the school board was paying Allen's companies ostensibly for pest control and other services.

## III. CONCLUSION

For the foregoing reasons, Waymer's convictions and sentence are AFFIRMED.