**UNITED STATES of America, Plaintiff,**

**v.**

**Patrick FREGA, G. Dennis Adams, and James A. Malkus, Defendants.**

**Criminal No. 96–698.**

United States District Court,
S.D. California.

July 9, 1996.

---

Alan Bersin, U.S. Attorney, Charles La-Bella, Phillip Halpern, Kevin Kelly, Assistant U.S. Attorneys, San Diego, CA, for U.S.

Dennis P. Riordan, Dylan L. Schaffer, of Riordan & Rosenthal, San Francisco, CA, for defendant Patrick R. Frega.

R. Jerry Coughlan, Barbara Howe Murray of Coughlan, Semmer & Lipman, San Diego, CA, for defendant James A. Malkus.

**1538**

Mario Conte, Federal Public Defenders of San Diego, San Diego, CA, for defendant G. Dennis Adams.

## MEMORANDUM OPINION AND ORDER RE: MOTIONS TO DISMISS COUNTS 1 AND 2–17 OF THE INDICTMENT

RAFEEDIE, District Judge: *

### Introduction

Defendants Patrick Frega, G. Dennis Adams, and James Malkus have been indicted on one count of conspiracy to commit bribery in violation of 18 U.S.C. § 666 and sixteen counts of mail fraud in violation of 18 U.S.C. §§ 1341, 1346. All three defendants have moved the Court to dismiss Counts 1 and 2–17 of the indictment on the ground that they fail to state federal offenses. The Court read the papers filed in connection with the memorandum, held a hearing on Count 1 on June 4, 1996 and on Counts 2–17 on June 25, 1996, and has had the benefit of oral argument of counsel. The Court HEREBY DISMISSES Count 1 of the indictment for failure to state a federal offense, but DENIES the motion to dismiss Counts 2–17.[1]

### Facts

In this case, the Court is confronted with grave allegations of a twelve year pattern of judicial corruption in the California Superior Court system in San Diego. During that time, Defendants Adams and Malkus were Superior Court judges, and Defendant Frega was a local plaintiff's attorney specializing in personal injury cases. Malkus has since resigned as a judge, Adams was removed by the California Commission on Judicial Performance,[2] and Frega continues to practice law in San Diego.

The forty-five page, eighteen count indictment charges that Frega gave the former judges gifts with the intent of influencing or rewarding them in regard to cases in which he was counsel of record and in which they were presiding, and that the judges accepted these gifts with the understanding that they would be corruptly influenced. Count 1 charges bribery in violation of 18 U.S.C. § 666, Counts 2–17 charge mail fraud in violation of 18 U.S.C. §§ 1341, 1346, and Count 18 charges Frega alone with racketeering in violation of 18 U.S.C. § 1962.[3]

According to the indictment, Malkus presided over at least five cases in which Frega appeared.[4] Of these cases, two resulted in $4 million verdicts for Frega's clients, and another in a $2 million settlement. Over the same period, Frega allegedly lavished on Malkus such gifts as a $612 health club membership, $9,900 in salary payments to Malkus' son for employment arranged by Frega with a former client, and over $3,500 in car repairs.

Similarly, Adams presided over or handled portions of at least seven cases in which Frega appeared. Of these, one resulted in a $5 million non-jury verdict in favor of Frega's client. The indictment does not disclose the results of the other cases. Over the same period, Frega supposedly paid over $1,700 for a professional writer to ghostwrite a novel for Adams, gave Adams a $2,000 computer, arranged for a former client to provide or contributed himself over $8,000 in car services to Adams and his family, arranged for the former client to sell a car to Adams at $1,000 below cost, contributed $4,000 and $2,200 toward the costs of cars for Adams' daughter and father respectively, and paid $614 for a new bed for Adams.

---

* U.S. District Court Judge for the Central District of California, sitting by designation.

1. This Opinion deals with the Indictment that was filed on April 9, 1996. Subsequently, the grand jury has returned two Superseding Indictments, the most recent on June 25, 1996. That indictment replaces the § 666 charge with a Racketeering Conspiracy, 18 U.S.C. § 1962(d).

2. *See Adams v. Commission on Judicial Performance*, 10 Cal.4th 866, 42 Cal.Rptr.2d 606, 897 P.2d 544 (1995).

3. The RICO count has not yet been subject to attack and is not the subject of this opinion.

4. It is not clear from the indictment whether Malkus actually had complete control of these cases, or whether he presided over them for more limited purposes, such as a particular motion.

The mail fraud counts are based on an alleged scheme "to defraud the people of the State of California by depriving them of their right to the honest services of Judges of the State Superior Court in San Diego County performed free from bribery, undue influence, and deceit." (Indictment, 30 at ¶2). The fraudulent scheme alleged was again that Frega gave gifts, which the former judges accepted, with the intent to influence or reward Adams and Malkus in cases that they presided over and in which Frega was counsel of record.

The mailings that form the jurisdictional element of the crime are as follows:

Count 2: May 31, 1991—"Notice of Case Management Conference";

Count 3: Aug. 26, 1991—"Notice of Change of Address";

Count 4: Sept. 30, 1991—"Ex Parte Application for Appointment of Settlement Judge";

Count 5: Sept. 30, 1991—"Declaration of Plaintiff's Counsel";

Count 6: Oct. 10, 1991—"Memorandum of Proposed Decision";

Count 7: Oct. 25, 1991—"Request for Dismissal";

Count 8: Nov. 1, 1991—"Letter from G. Dennis Adams" (to Commission on Judicial Performance);

Count 9: Nov. 5, 1991—"Letter from Michael I. Greer" (to Commission on Judicial Performance);

Count 10: Nov. 14, 1991—"Letter from G. Dennis Adams" (to Commission on Judicial Performance);

Count 11: Nov. 26, 1991—"Order";

Count 12: Dec. 26, 1991—"Letter from G. Dennis Adams" (to Commission on Judicial Performance);

Count 13: Apr. 7, 1992—"Letter from Patrick R. Frega" (to Commission on Judicial Performance);

Count 14: Apr. 8, 1992—"Letter from James E. Fitting" (to Commission on Judicial Performance);

Count 15: Apr. 14, 1992—"Opposition to Objections to Proceedings before James A. Malkus";

Count 16: Apr. 14, 1992—"Verified Answer of Judge Malkus"; and

Count 17: Nov. 10, 1993—"Letter from James A. Malkus" (to Commission on Judicial Performance).

## Discussion

### I. Count 1—18 U.S.C. § 666 (Bribery)

Although the defendants mount a number of attacks on Count 1 of the indictment, the only one that the Court finds persuasive is the jurisdictional challenge to the reach of 18 U.S.C. § 666.[5] Since that attack is dispositive, the Court need not and therefore does not reach the other issues.

The primary issue in this case is whether § 666 reaches conduct of the sort alleged in Count 1—conduct that may generally be described as bribery and illegal gratuities.[6]

---

**5.** The statute states in relevant part:
(a) Whoever, if the circumstance described in subsection (b) of this section exists—
   (1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—

   ·   ·   ·   ·   ·

   (B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more; or
   (2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;

shall be fined under this title, imprisoned not more than 10 years, or both.
   (b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

**6.** The defendants argue that Count 1 fails to allege illegal gratuities, as it states its language purely in terms of "bribery." However, the indictment charges that the illegal payments "were made and received with the intent to influence and reward." Indictment, ¶ 12. This language

Resolution of this matter is one of statutory interpretation.

■ The general rule of statutory interpretation is that the Court is to begin with the language of the statute itself. *Randall v. Loftsgaarden,* 478 U.S. 647, 656, 106 S.Ct. 3143, 3149, 92 L.Ed.2d 525 (1986); *Reiter v. Sonotone Corp.,* 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979). If the language of the statute "is sufficiently clear in its context and not at odds with the legislative history," then there is no need to consider other policy issues. *Randall,* 478 U.S. at 656, 106 S.Ct. at 3149. Moreover, the Court is "not free to substitute legislative history for the language of the statute." *Aronsen v. Crown Zellerbach,* 662 F.2d 584, 588 n. 7 (9th Cir.1981).

## A. Ambiguities in the Statute As Applied

■ In this case, however, the Court concludes that the plain language of § 666 is not clear as to whether it applies to the conduct alleged in this case. First, where an interpretation of a federal criminal statute would upset the balance of power between the federal and state governments, Congress must express its intention clearly for a court to adopt that interpretation. *United States v. Bass,* 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971). Second, the Court has difficulty determining how the particular transactions in this matter—the cases over which Malkus and Adams presided—would be valued so as to satisfy the $5,000 transaction element of § 666.

### 1. Federal–State Balance

Under the Government's theory of prosecution, § 666 would become a federal anti-bribery statute. Every state falls within the $10,000 federal funding jurisdiction element, and thus, every state employee would fall within the jurisdiction of the statute.[7] There remains, of course, the $5,000 transaction requirement, but according to the Government, any such transaction would be covered by § 666, even if there were no connection at all to federal funds.

This reading of § 666 is certainly not implausible. However, it would drastically change the balance of power between federal and state governments by bringing conduct that had previously been entirely in the realm of the states within the federal purview. Yet, "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance." *Bass,* 404 U.S. at 349, 92 S.Ct. at 523.

In *Bass,* the issue was whether 18 U.S.C. § 1202, which made it a crime for a felon to "receive[ ], possess[ ], or transport[ ] in commerce or affecting commerce" any firearm, required the Government to prove that a defendant had possessed a firearm "in commerce or affecting commerce," or whether that phrase modified only the prohibited act of transportation. Confronted with an ambiguous statute and equally ambiguous legislative history, the Supreme Court concluded that the phrase applied to the prohibited act of possession. Otherwise, the statute would have made general possession of firearms by felons criminal and "would alter sensitive federal-state relationships [and] could overextend limited federal police resources." *Id.*

The situation in this case is akin to that in *Bass.* Although Congress may well have the constitutional authority to enact a national anti-bribery statute, such a statute would thrust the federal government into prosecuting "conduct readily denounced as criminal by the States." *Id.* In this regard, it is significant that California has enacted statutes to prohibit the bribery of state court judges. Calif. Penal Code § 92 states that:

> [e]very person who gives or offers to give a bribe to any judicial officer ... with intent to influence his ... decision ... is punishable by imprisonment in the state prison for two, three or four years.

Similarly, Calif. Penal Code § 93 states that

> [e]very judicial officer ... who asks, receives, or agrees to receive, any bribe,

---

tracks that of § 666 itself, while notably does not mention "gratuity."

**7.** At oral argument, the United States agreed that its construction of the statute would enable it to prosecute, for example, "a secretary for a state parking agency receiv[ing] federal funds." (Transcript of June 4, 1996 hearing, at 16:9–10).

upon any agreement or understanding that his vote, opinion, or decision upon any matters or question which is or may be brought before him for decision, shall be influenced thereby, is punishable by imprisonment in the state prison for two, three, or four years.

Since California has made this conduct criminal, there must be a clear statement of Congress' intention to have § 666 reach this same conduct. Therefore, the Court must examine the legislative history of the statute to seek such a clear statement of intent.

### 2. $5,000 Transaction Element

A second difficulty in applying § 666 to the conduct alleged in Count 1 relates to the $5,000 transaction requirement. It is clear that Count 1 charges that the transactions are intended to be the cases over which Adams and Malkus presided and in which they were allegedly corruptly influenced.[8] However, the indictment fails to allege that these cases were valued at $5,000 or more, as is required by the statute.

This omission appears to be more than a simple technical error, as it is unclear how the United States intends to value the cases that Adams and Malkus presided over. The Court can conceive of at least three ways in which the cases could be valued: (1) the amount in controversy;[9] (2) the ultimate settlement value or verdict; or (3) the value of the case to Frega. Nowhere does the indictment explain the Government's theory of valuation.

Significantly, if § 666 is used to prosecute non-federal employees who corruptly administer federal funds, even if federal funds are not directly threatened, there is only one measure of value: the value of the funds corruptly transacted. *See, e.g., United States v. Valentine*, 63 F.3d 459, 461–62 (6th Cir.1995) (transactions were $8,363 misappropriated from copying fees and $7,000 of lost

wages when employee labor was misappropriated for personal use); *United States v. Wyncoop*, 11 F.3d 119, 120 (9th Cir.1993) (transaction was $65,000 in federal student loans); *United States v. Simas*, 937 F.2d 459, 463 (9th Cir.1991) (transaction was stair cleaning project worth $5,790); *United States v. Westmoreland*, 841 F.2d 572, 575 (5th Cir.1988) (transactions were purchases of goods worth $14,482.92).

This ambiguity in calculating the transaction value, combined with the lack of ambiguity in other cases, indicates that the language of the statute is insufficiently clear to determine whether the statute was meant to apply to the situation at hand.

### B. Legislative History

■ Where a statute is not plainly clear on its face, the Court is to consider the legislative history and the context of enactment of the statute. *See Dowling v. United States*, 473 U.S. 207, 213, 105 S.Ct. 3127, 3131, 87 L.Ed.2d 152 (1985); *United States v. Aguilar*, 21 F.3d 1475, 1480 (9th Cir.1994) (noting that it cannot be said "that the language of the statute clearly expresses the congressional intent"), *rev'd on other grounds*, —— U.S. ——, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995).

Section 666 was added to Title 18 in 1984 as part of the 1985 continuing appropriations for the Comprehensive Crime Control Act of 1984. In enacting the section, the Congressional committee indicated that the purpose of the statute was "to protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery." Senate Report No. 98–225, 1984 U.S.C.C.A.N. 3182, 3510–11. While the statute was meant to be construed broadly, according to the report, its reach was not meant to be unlimited:

> [N]ot every Federal contract or disbursement of funds would be covered. For

---

8. "[M]ore than $100,000.00 in bribe payments ... were made and received with the intent to influence and reward California Superior Court Judges *in connection with cases in the California State Court system.*" Indictment, ¶ 12 (emphasis added). This language is exactly parallel to that of the statute, which requires that the bribe or gratuity be "in connection with any business,

transaction, or series of transactions ... involving anything of value of $5,000 or more." 18 U.S.C. § 666(a)(1)(B).

9. *See* 28 U.S.C. § 1332(a) (providing diversity of citizenship subject-matter jurisdiction where the amount in controversy exceeds $50,000).

example, if a government agency lawfully purchases more than $10,000 in equipment from a supplier, it is not the intent of this section to make a theft of $5,000 or more from the supplier a Federal crime.

*Id.*

■ Congress thus had a specific purpose in mind when it enacted § 666: the closing of loopholes left by 18 U.S.C. § 641 and 18 U.S.C. § 201, which respectively prohibit the theft of federal government property and the bribing of federal public officials. These statutes, however, failed to cover conduct where federal funds were stolen and then comingled with non-federal funds so that federal funds could not be traced. They also failed to cover many situations involving non-federal employees who corruptly administered federal funds.

The Senate Report identified three cases that Congress intended the statute to cover: *United States v. Hinton,* 683 F.2d 195 (7th Cir.1982), *aff'd sub nom., Dixson v. United States,* 465 U.S. 482, 104 S.Ct. 1172, 79 L.Ed.2d 458 (1984); *United States v. Del Toro,* 513 F.2d 656 (2d Cir.), *cert. denied,* 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975); *United States v. Mosley,* 659 F.2d 812 (7th Cir.1981). All three cases involved non-federal employees who administered federal funds corruptly. Although two of the cases concluded that § 201 reached this conduct, they entailed fairly detailed factual analyses of the nature of the federal funding statutes involved and required conclusions that non-federal employees were nevertheless federal agents due to the degree of supervision they received. Moreover, the cases indicated that state employees who administered federal funds without substantial federal oversight and involvement would not be subject to § 201. By citing these cases specifically in the legislative history, Congress evidenced an intent to close the loophole left by these cases.

■ Thus, although Congress did intend § 666 to have a broad application, that broadness is in regard to the protection of federal funds. The Government need not be able to trace the federal funds directly; it is sufficient if the state employee has access—control is not necessary—to comingled state and federal funds. *Simas,* 937 F.2d at 463 (Bay Area Rapid Transit manager who took bribes in exchange for disbursement of contracts for goods and services). Indeed, the Government relies heavily on *Simas,* but that case appears to the Court to be consistent with the Court's interpretation, as it noted that "Congress has cast a broad net to encompass local officials who may administer federal funds, regardless of whether they actually do." *Id.*

■ The specificity required for prosecution under § 666 is demonstrated in other ways. Section 666 contains a jurisdictional element that the organization, government, or agency receive more than $10,000 in federal funding in a year. A survey of published cases involving § 666 indicates that courts have required that this funding be shown to exist at a fairly specific level, and not at the general governmental level. For example, the defendant in *United States v. Valentine,* 63 F.3d 459 (6th Cir.1995), worked as Secretary/Treasurer of the water department for a Tennessee city. The Sixth Circuit held that § 666 required a showing that the water department, as opposed to the city government, receive more than $10,000 in federal funding in a given year.[10] *Id.* at 462; *see also Simas,* 937 F.2d at 463 (multi-county transportation agency as the recipient, as opposed to the counties). This specificity is significant in that it reinforces the view that § 666 was intended to protect the integrity of federal funds, and not as a general anti-corruption statute. Otherwise, the $10,000 element in *Valentine* could have been satisfied by the fact that the city received more than $10,000 in federal funding, and as an employee of the municipal water department, the defendant was a city employee.

Of course, state court judges could be subject to § 666 in certain circumstances. For example, if the state court system received federal funding for the purpose of appointing

10. The defendant also worked as the City Recorder, and in that position, the jurisdictional element was satisfied by showing that the city received more than $10,000 in federal funding in a year. *Id.* at 462.

counsel in death penalty habeas proceedings, and a state court judge accepted a bribe in exchange for appointing a particular attorney as habeas counsel, § 666 would clearly be implicated, even if the actual funds used to pay counsel were state funds. Indeed, § 666 might be implicated even in the absence of a specific directive for the federal funding, if misappropriation of employment were involved. *See Valentine,* 63 F.3d at 461–62 (using government employees for personal errands); *United States v. Grubb,* 11 F.3d 426, 434 (4th Cir.1993) (providing two years of county government employment). However, there is no such implication in this case.[11]

Accordingly, the Court concludes that the legislative history of § 666 demonstrates that Congress intended a broad reach for the statute, but only as to the protection of federal funds. In this case, the indictment does not allege that federal funds were corruptly administered, were in danger of being corruptly administered, or even could have been corruptly administered. Although the alleged conduct of the defendants is troubling, it does not appear to have threatened, either directly or indirectly, federal funds. For that reason, the Court dismisses Count 1 of the indictment.

## II. Counts 2–17—18 U.S.C. § 1341 (Mail Fraud)

Next, the defendants attack the sixteen mail fraud counts. Malkus raises two grounds for dismissing the mail fraud counts: (1) "scheme to defraud" does not encompass public corruption; and (2) the mail fraud statute is unconstitutionally vague. Frega adds two grounds: (3) deprivation of honest services can only involve bribery or some

reference to state law; and (4) the mailings were not false.

### A. Public Corruption and the Reach of 18 U.S.C. § 1346

The first argument raised by the defendants is that §§ 1341, 1346 do not reach the intangible right of honest public services. This argument is drawn entirely from the recent Fifth Circuit case of *United States v. Brumley,* 79 F.3d 1430 (5th Cir.1996), and so the Court will explain the analysis of that case in some detail.

In *Brumley,* the defendant was a state workers' compensation official who accepted over $86,000 in loans from a local attorney between 1987 and 1992, with the understanding that the loans would never be repaid. During that same time, the defendant attempted to derail a state workers' compensation agency investigation of a local attorney. The defendant first urged the agency to reconsider its decision to investigate; when that failed, he helped the attorney alter subpoenaed documents. Based on this conduct, the defendant was convicted of three counts of wire fraud, three counts of money laundering, and one count of conspiracy to commit mail and wire fraud. 79 F.3d at 1432–33.

The Fifth Circuit concluded that the wire fraud statute [12] did not reach this conduct and reversed the convictions. The central issue in the case was whether the definition in § 1346 was intended to reach public corruption. The court concluded that the term "another" in the section was ambiguous as to what it referred.

Therefore, the court turned to the legislative history of § 1346 for guidance. Section 1346, however, contained only two pieces of

11. At the hearing, the Government suggested that the defendants' actions had jeopardized the financial integrity of the state of California, since the state court system would now have to handle attempts to reopen judgments rendered by Adams and Malkus. However, this argument would swallow § 666 entirely, since in almost every instance that bribery of state officials occurs, there will be attempts to redo tainted decisions.

12. For the purposes of this matter, the wire fraud and mail fraud statutes are identical. *See United States v. Manarite,* 44 F.3d 1407, 1411 n.

5 (9th Cir.1995) (noting that wire fraud is interpreted in light of mail fraud cases). Wire fraud, 18 U.S.C. § 1343, states in relevant part: "Whoever, having devised or intending to devise any scheme or artifice to defraud, ... transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both."

legislative history. *Id.* at 1435–37. One was Representative Conyer's statement that:

> This amendment restores the mail fraud provision to where that provision was before the *McNally* decision. The amendment also applies to the wire fraud provision and precludes the *McNally* result with regard to that provision.... This amendment is intended merely to overturn the *McNally* decision. No other change in the law is intended.

134 Cong.Rec. H11, 108–01 (daily ed. Oct. 21, 1988). The other piece of legislative history was a Senate Judiciary Report detailing the Congressional intent in enacting § 1346 and other laws. That report stated in relevant part:

> This section overturns the decision of *McNally v. United States* in which the Supreme Court held that mail and wire fraud statutes protect property but not intangible rights. Under the amendment, those statutes will protect any person's intangible right to the honest services of another, including the right of the public to the honest services of public officials. The intent is to reinstate all of the pre-*McNally* case law pertaining to the mail and wire fraud statutes without change.

134 Cong.Rec. S17, 360–02 (daily ed. Nov. 10, 1988).

The court found this legislative history to be unpersuasive. First, the statement by Rep. Conyer was not given any weight because it was the contemporaneous remark of a sponsor of legislation. Second, the Senate Judiciary Report was given no weight because "post-enactment statements of a congressional committee are not entitled to much weight." *Brumley,* 79 F.3d at 1437. Finally, the court asserted that Congress could not overturn a Supreme Court decision through legislation. Thus, the court deemed any statements of such intent to be invalid. *Id.*

The court also was persuaded by the fact that at the time that it enacted § 1346, Congress had two other pending bills that would have extended the statute to reach public corruption. The fact that these bills were not passed was evidence, in the court's view, that Congress did not intend mail fraud to reach public corruption. *Id.* at 1437–39.

One judge of the three-judge panel dissented, concluding that Congress could have been more precise in its drafting, but that the legislative history was clear and not contradicted by any other statements in the record.

In the Court's view, *Brumley* has severe flaws in its analysis, and since it is not controlling authority, the Court declines to follow it.

### 1. Statutory Interpretation Decisions

■■■■■■ First, the two-judge majority concluded without citation that Congress could not enact legislation to undo the result in *McNally.* While this assertion is true with regard to Supreme Court decisions of *constitutional review,* it is obviously not true with regard to decisions of *statutory interpretation. See Rivers v. Roadway Express,* 511 U.S. 298, ——, 114 S.Ct. 1510, 1515, 128 L.Ed.2d 274 (1994) (accepting that Congress can "enact a statute that responds to a judicial decision"); *Hilton v. South Carolina Public Railways Comm'n,* 502 U.S. 197, 202, 112 S.Ct. 560, 563–64, 116 L.Ed.2d 560 (1991) ("Congress has had almost 30 years in which it could have corrected our decision in *Parden [v. Terminal Ry. of Alabama State Docks Dept.,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964)] if it disagreed with it, and has not chosen to do so."); *Patterson v. McLean Credit Union,* 491 U.S. 164, 172–73, 109 S.Ct. 2363, 2370–71, 105 L.Ed.2d 132 (1989) ("[U]nlike in the context of constitutional interpretation, the legislative power is implicated, and Congress remains free to alter what we have done").[13]

---

**13.** *See also Quill Corp. v. North Dakota,* 504 U.S. 298, 318, 112 S.Ct. 1904, 1916, 119 L.Ed.2d 91 (1992) (noting that with regard to Supreme Court decisions based on the Dormant Commerce Clause, "Congress remains free to disagree with our conclusions"); 49 U.S.C. § 1513 (Airport Development Acceleration Act of 1973)

(overruling *Evansville–Vanderburgh Airport Authority District v. Delta Airlines, Inc.,* 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972); 73 Stat. 555, 15 U.S.C. §§ 381–84 (overruling *Northwestern States Portland Cement Co. v. Minnesota,* 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959); 59 Stat. 33, 15 U.S.C. § 1011

*McNally v. United States* was a case involving statutory interpretation, and not constitutional review, as is clear from that case's statement that "[i]f Congress desires to go further, it must speak more clearly than it has." 483 U.S. 350, 360, 107 S.Ct. 2875, 2881–82, 97 L.Ed.2d 292 (1987). Thus, in *McNally*, the Supreme Court did not rule that Congress lacked the constitutional authority to criminalize public corruption. Accordingly, Congress had the authority to "undo" the decision in *McNally*.

### 2. Clear Legislative History

Second, *Brumley*'s decision to ignore the legislative history concerning § 1346 is curious. *Brumley* cites *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118, 100 S.Ct. 2051, 2061, 64 L.Ed.2d 766 (1980), and *Chrysler Corp. v. Brown*, 441 U.S. 281, 311, 99 S.Ct. 1705, 1722–23, 60 L.Ed.2d 208 (1979), for the proposition that "the Supreme Court has never attributed a great deal of significance to contemporaneous remarks of a sponsor of legislation." *Brumley*, 79 F.3d at 1437. It then cites *GTE Sylvania* and *Weinberger v. Rossi*, 456 U.S. 25, 33–36, 102 S.Ct. 1510, 1516–1518, 71 L.Ed.2d 715 (1982), for the proposition that "post-enactment statements of a congressional committee are not entitled to much weight." *Brumley*, 79 F.3d at 1437.

However, *Brumley* appears to have accorded this legislative history *no* weight, rather than not much weight. Otherwise, there would have been no need to turn to the discarded versions of § 1346. In particular, there is no legislative history that contradicts Rep. Conyer's statement or that of the Judiciary Committee regarding Congress' intent in enacting § 1346. Had there been some contrary statements, then ignoring that legislative history would have been understandable.

Moreover, the statements by Rep. Conyer and the Judiciary Committee are completely consistent with the context of the enactment of § 1346. In *McNally*, the Supreme Court stated:

(McCarran–Ferguson Act of 1945) (overruling *United States v. South–Eastern Underwriters Ass'n*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440

[W]e read § 1341 as limited in scope to the protection of property rights. If Congress desires to go further, it must speak more clearly than it has.

483 U.S. at 360, 107 S.Ct. at 2882. One year later, Congress enacted § 1346. The timing of these events cannot be coincidental; Congress was responding to the Supreme Court's invitation to extend the scope of § 1341.

Finally, *Brumley* places great weight on H.R. 3050 and S. 2973, alternate versions of § 1346 wherein public corruption was explicitly mentioned, as proving that Congress did not intend for § 1346 to reach public corruption. The Court finds these alternative bills to be unpersuasive evidence on the issue of whether Congress intended to extend mail fraud to public officials. H.R. 3050 stated:

As used in Sections 1341 and 1343, the term "defraud" includes the defrauding of the citizens of a body politic (1) of their right to the conscientious, loyal, faithful, disinterested and unbiased performance of official duties by a public official thereof; or (2) of their right to have the public business conducted honestly, impartially, free from bribery, corruption, bias, dishonesty, deceit, official misconduct and fraud.

Similarly, S. 2793 would have created a new section, 18 U.S.C. § 225, entitled "Public Corruption." This bill would have made it a federal crime to use the mails, wires, or interstate commerce to deprive or defraud citizens of the honest services of government officials. *Brumley* seizes on the fact that the House did not accept this text as part of the Anti–Drug Abuse Act of 1988 to argue that the House "clearly refused to join the Senate." 79 F.3d at 1439.

However, it is equally plausible to conclude that the House declined to pass its equivalent of S. 2793 because § 1346 encompassed S. 2793 and made the latter bill unnecessary. Or perhaps the House concluded that S. 2793 was too narrow in scope, as it does not purport to reach private corruption through the mails. Since there is no legislative history as to why the House acted the way that it

(1944)); *see generally* Abner J. Mikva & Jeff Bleich, *When Congress Overrules the Court,* 79 Calif.L.Rev. 729, 732–33 (1991).

did, it is difficult to see how the Fifth Circuit could use the House's inaction to interpret Congress' intent with regard to § 1346 in a way contrary to the legislative history on § 1346.[14]

### 3. Superfluousness

Third, *Brumley*, as interpreted by Frega, renders § 1346 superfluous in light of *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). According to Frega, § 1346—and *Brumley*—merely extend the reach of mail fraud to intangible property rights.

However, prior to the enactment of § 1346, in *Carpenter*, the Supreme Court held that the mail fraud statute, while it did not reach public corruption, did reach intangible property rights. The intangible property in question consisted of proprietary business information in a newspaper column that was yet to be published. In distinguishing *McNally*, the Supreme Court held that "*McNally* did not limit the scope of § 1341 to tangible as distinguished from intangible property rights." *Id.* at 25, 108 S.Ct. at 320.

■■■ Congress is presumed to have amended a statute with the knowledge of Supreme Court decisions regarding that statute. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 382 & n. 66, 102 S.Ct. 1825, 1841 & n. 66, 72 L.Ed.2d 182 (1982); *Lorillard v. Pons*, 434 U.S. 575, 580–81, 98 S.Ct. 866, 869–70, 55 L.Ed.2d 40 (1978). Furthermore, a statute should not be construed so as to make any aspect superfluous. *Boise Cascade Corp. v. Environmental Protection Agency*, 942. F.2d 1427, 1432 (9th Cir.1991); *Wilshire Westwood Associates v.*

*Atlantic Richfield Corp.*, 881 F.2d 801, 804 (9th Cir.1989). Thus, Frega's argument that § 1346 merely extended the mail fraud statute to protect intangible property rights is incorrect.

### 4. "Another"

■■■ It is worth mentioning that *Brumley* hinges on the ambiguity in the definition of the word "another." Through this ambiguity, the case is able to turn to and then ignore the legislative history concerning § 1346. However, like the dissenting judge in *Brumley*, the Court believes that "another" can easily be read to include a state citizen, who would be the victim of the public corruption fraud. The indictment adopts this theory, as the victims of the fraud are identified as "the people of the State of California." (Indictment, 30 at ¶ 2).

### 5. Other Cases

Notably, every other case that has considered the effect of § 1346 has deemed it to override *McNally*. In *West Virginia University Hospitals, Inc. v. Casey*, 499 U.S. 83, 114–15, 111 S.Ct. 1138, 1155, 113 L.Ed.2d 68 (1991) (Stevens, J., dissenting), Justice Stevens concluded that Congress "quickly corrected" the result in *McNally*. In *United States v. Dischner*, 974 F.2d 1502, 1518 n. 16 (9th Cir.1992), *cert. denied*, 507 U.S. 923, 113 S.Ct. 1290, 122 L.Ed.2d 682 (1993), the Ninth Circuit noted in dicta that "*McNally* has since been nullified by statute." Every Circuit has reached the same conclusion. *United States v. Grandmaison*, 77 F.3d 555, 566 (1st Cir.1996); *United States v. Catalfo*, 64 F.3d 1070, 1077 n. 5 (7th Cir.1995), *cert.*

---

**14.** At the June 25 hearing, Malkus argued that the issue was not so much whether Congress could amend the mail fraud statute to reach public corruption, but whether Congress had taken sufficient steps to amend the statute in light of *McNally*. It is true that in *McNally* the Supreme Court expressed a' reluctance to "involve[] the Federal Government in setting standards of disclosure and good government for local and state officials." 483 U.S. at 360, 107 S.Ct. at 2882.' However, this statement does not mean that Congress *must* set such standards clearly in order for the statute to be valid; rather, the lack of standards at the time suggested that Congress may not have intended the broader reading, and that in the absence of direction from Congress, the

Court would assume, as a matter of statutory interpretation, that Congress intended the more narrow reading. Indeed, framing the issue as Malkus does, of whether Congress did enough to amend the statute begs the question. Either Congress has the constitutional authority to expand the mail fraud statute to cover public corruption or it does not, *cf. United States v. Lopez*, — U.S. —, —, 115 S.Ct. 1624, 1626, 131 L.Ed.2d 626 (1995) (striking down the Gun–Free School Zones Act as beyond the power of Congress to enact); and if it has the authority, then either it used that authority or it did not. Section 1346 quite obviously responds to that point by signalling that Congress in fact intended the broader reading of the mail fraud statute.

denied, —— U.S. ——, 116 S.Ct. 1683, 134 L.Ed.2d 784 (1996); *United States v. Bryan,* 58 F.3d 933, 940 n. 1 (4th Cir.1995); *United States v. Waymer,* 55 F.3d 564, 568 n. 3 (11th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1350, 134 L.Ed.2d 519 (1996); *United States v. DeFries,* 43 F.3d 707, 709 n. 1 (D.C.Cir.1995); *United States v. Thomas,* 32 F.3d 418, 419 (9th Cir.1994); *United States v. Mittelstaedt,* 31 F.3d 1208, 1211 (2d Cir. 1994), *cert. denied sub nom.,* —— U.S. ——, 115 S.Ct. 738, 130 L.Ed.2d 640 (1995); *United States v. Holley,* 23 F.3d 902, 910 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 635, 130 L.Ed.2d 542 (1994); *United States v. Ames Sintering Co.,* 927 F.2d 232, 235 (6th Cir.1990); *United States v. Granberry,* 908 F.2d 278, 281 n. 1 (8th Cir.1990), *cert. denied,* 500 U.S. 921, 111 S.Ct. 2024, 114 L.Ed.2d 110 (1991); *United States v. Martinez,* 905 F.2d 709, 715 (3d Cir.), *cert. denied,* 498 U.S. 1017, 111 S.Ct. 591, 112 L.Ed.2d 595 (1990).

.The Court therefore concludes that *Brumley* was decided incorrectly and declines to follow it.

### B. Void for Vagueness Doctrine

■ Next, Malkus argues that § 1346 is unconstitutionally vague, because the term "honest services" is defined nowhere within the United States Code.

■ The void for vagueness doctrine stems from the Due Process Clause and "requires that the meaning of a penal statute be determinable." *Schwartzmiller v. Gardner,* 752 F.2d 1341, 1345 (9th Cir.1984). Thus, a statute will be struck down "if it fails to give adequate notice to people of ordinary intelligence concerning the conduct it proscribes." *Id.*

The Court must consider whether § 1346, as applied to these defendants and the activities alleged in the indictment, is vague. The Eleventh Circuit has rejected this same challenge in *United States v. Waymer,* 55 F.3d 564, 568 (11th Cir.1995). In *Waymer,* the defendant was a member of the Atlanta Board of Education who entered into a business relationship with the president of a service company. Under the terms of this agreement, the defendant would receive a 15 percent commission on service contracts for sanitation and pest control of two local schools. Although the defendant disclosed the existence of his relationship with the president of the service company, the defendant did not disclose the commission arrangement. The jury concluded that the defendant had specifically intended to commit a fraud on Atlanta's citizens. This finding was sufficient to conclude that the statute was not unconstitutionally vague as applied, since the Government carried its burden of proving specific intent. *Id.* at 568–69.

The indictment in this case alleges that Frega, Malkus, and Adams devised a scheme "to defraud the people of the State of California by depriving them of their right to the honest services of Judges of the State Superior Court in San Diego County performed free from bribery, undue influence, and deceit." (Indictment, 30 at ¶ 2). As in *Waymer,* the Government has alleged specific intent to defraud. In fact, even if the term "honest services" is unconstitutionally vague—which it does not appear to be—in this case the indictment further defines it as freedom "from bribery, undue influence, and deceit." These allegations must be taken as true. *United States v. Bohonus,* 628 F.2d 1167, 1174 (9th Cir.), *cert. denied,* 447 U.S. 928, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980). It is not unreasonable to conclude that a person of reasonable intelligence would conclude that the accepting of bribes while sitting as a judge constituted a criminal offense. Certainly, the criminal nature of these activities is more apparent than the nondisclosure in *Waymer. Cf. Bohonus,* 628 F.2d at 1174–75 (accepting of kickback payments was clearly fraudulent).

### C. Bribery or Other State Law Reference

Next, Frega argues that the fraudulent scheme must be limited to bribery schemes, meaning that there must be some nexus between the gifts/bribes and acts taken by the judges. Primarily, Frega relies on statements made by Senator Biden in his effort to pass S. 2973.

In 1989, Senator Biden stated on the record:

[Section 1346] allowed the government to resume prosecution of those public corruption cases that involve bribes, kickbacks, and conflicts of interest, since such acts of wrongdoing deprive the public of its right to the honest services of a public official.

Statement of Senator Biden, 135 Cong.Rec. S 1063 (daily ed. Feb. 2, 1989). Frega argues that Senator Biden's interpretation of § 1346 is rational, and where there are two rational readings of a criminal statute, the more lenient one must be adopted unless Congress has clearly indicated otherwise.

However, if one examines Senator Biden's full statement carefully, it becomes apparent that he did not intend for the list above to be exclusive. In his statement, he discusses the shortcomings of § 1346. First, election fraud was not covered by the statute. Second, persons who provide false information were not covered by the statute. Third, mail and wire fraud did not reach "modern technology and commercial delivery systems." *Id.* The activities alleged in the indictment do not fall within these exceptions, and therefore it is arguable whether Senator Biden would have considered them to be covered by § 1346.

Moreover, even the scope of coverage by § 1346 detailed by Senator Biden indicates that the activities alleged in the indictment are sufficiently covered: "bribes, kickbacks, and conflicts of interest." The indictment charges the defendants with scheming to defraud the public through bribery, undue influence, and deceit. The pattern of undue influence and deceit is one of severe conflicts of interest.

Frega also argues that mail fraud must reference explicitly established standards in order to provide notice to a defendant that his or her conduct is criminal. *McNally* contained language to this effect, when the Supreme Court noted that "if state law expressly permitted or did not forbid a state officer ... to have an ownership interest in an insurance agency handling the state's insurance, it would take a much clearer indication than the mail fraud statute evidences to convince us that having and concealing such

an interest defrauds the State and is forbidden under federal law." 483 U.S. at 361 n. 9, 107 S.Ct. at 2882 n. 9.

There is, to be sure, some ambiguity as to the outer reaches of the mail fraud statute. However, pre-*McNally* courts did not resort to state law standards to define the forbidden conduct. *See United States v. Lemire,* 720 F.2d 1327, 1335–36 (D.C.Cir.1983) ("The duty breached need not arise from state or federal law; in particular, it may stem from an employment relationship of the sort that imposes discretion and consequently obligations of loyalty and fidelity on the employee."); *see also United States v. Von Barta,* 635 F.2d 999, 999 (2d Cir.1980), *cert. denied,* 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981); *Bohonus,* 628 F.2d at 1172; *United States v. Reece,* 614 F.2d 1259, 1261 (10th Cir.1980). Since the Court has interpreted § 1346 as restoring the federal common law regarding mail fraud to the pre-*McNally* state, *Lemire* and these other cases are relevant precedents.

### D.  Mailing Element

■■■ Finally, Frega argues that the mailings alleged in the indictment do not satisfy the mailing element of the mail fraud statute. The statute merely requires that, as part of the scheme to defraud, the defendant "places in any post office ... any matter or thing whatever to be sent or delivered by the Postal Service." 18 U.S.C. § 1341.

However, in *Parr v. United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), the Supreme Court reversed the mail fraud convictions of defendants accused of defrauding the school district while mailing innocent letters and tax statements that were required to be mailed by law. *Id.* at 390–91, 80 S.Ct. at 1183–84. The mailings were not "unlawful 'step[s] in a plot,'" "part[s] of the execution of the fraud," "incident to an essential part of the scheme," or "made 'for the purpose of executing such scheme.'" *Id.* at 391, 80 S.Ct. at 1183 (citations omitted) (alterations in original). *Parr* recognized that the facts in the case were "unique," and therefore, it seemed to limit itself to its factual situation.

*Parr* does not apply if the documents that are required to be mailed are themselves false. *United States v. Dadanian*, 818 F.2d 1443, 1446 (9th Cir.1987), *reh'g and rev'd on other grounds*, 856 F.2d 1391 (1988). Thus, Counts 8, 9, 10, 12, 13, 14, 16 and 17 need not be dismissed under *Parr*, because the indictment alleges that these mailings to the Judicial Commission were false. (Indictment, 32 at ¶ 5(g)).

Although the Indictment does not specifically state that the mailings for the other counts are false or were not required by law to be mailed, the Government has explained the alleged falsity or non-requirement of mailing in its Opposition. The mailings in Counts 2 and 3 were false because Frega had omitted his name from the pleadings, allegedly to hide his association in the cases. Counts 4 and 5 were mailings that were not required by law, but were instead attempts to further the scheme to defraud by seeking appointment of Adams as a settlement judge. Count 6 was allegedly a mailing of a proposed decision from Malkus to Frega. A proposed opinion cannot be considered to have been required by law to be mailed. Count 7, a Request for Dismissal, and Count 11, an Order signed by Malkus, have been alleged not to have been required by law to be mailed. Count 15 is a mailed Opposition to Objection to Proceedings before Malkus. Opposing counsel apparently sought to recuse Malkus, to which Frega objected. Frega's opposition was thus not a required mailing, but instead a furtherance of the scheme to defraud.

Therefore, the Court denies the motion to dismiss the mail fraud counts.

### Conclusion

The Court does not dismiss Count 1 of the indictment lightly. Allegations of a conspiracy to fix judicial decisions strike at the very heart of notions of fairness and due process. However, review of the legislative history of § 666 leads the Court to conclude that the statute was intended to have a broad reach with respect to particular conduct, but that the acts alleged in this case do not fall within that proscribed conduct.

As to Counts 2–17, the Court concludes that the mail fraud statute, 18 U.S.C. §§ 1341, 1346, reaches public corruption, is not unconstitutionally vague as applied to the conduct alleged in this case, and need not reference state law to define fraudulent conduct. Furthermore, the mailings in this matter do not fall within the rule of *Parr*, as they have been alleged to be either false or not required by law.

IT IS SO ORDERED.